# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PITCAIRN PROPERTIES HOLDINGS, INC.**[1] | **Case No. 10-** _12 764_ |
| **Debtor.** | |

## DECLARATION OF SALAH A. MEKKAWY
## IN SUPPORT OF FIRST DAY MOTIONS

I, Salah A. Mekkawy, do hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1.  I am the Chairman & CEO of Pitcairn Properties Holdings, Inc. ("PPHI" or the "Debtor"), a corporation organized under the laws of Delaware and the above-captioned debtor and debtor-in-possession. I have been authorized by a resolution of PPHI's board of directors to submit this declaration (the "Declaration").

2.  PPHI is a holding company that conducts its business operations through two wholly-owned direct and indirect operating subsidiaries, Pitcairn Properties, Inc. ("PPI") and Pitcairn Properties Management Company, LLC ("PPMC"), respectively, and a collection of limited partnerships, limited liability companies and similar entities that are directly or indirectly, wholly or partially owned by PPHI.

3.  I have been the Chairman and CEO of PPHI and PPI since 1998.

4.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my information and belief and my review of the Debtor's books and records and other information, including discussions with outside advisors, as well as my experience and

---

[1] The last four digits of the Debtor's federal tax identification number are 3452. The Debtor's address is One Pitcairn Place, 165 Township Line Road, Suite 1500, Jenkintown, PA 19046-3599.

knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth herein.

5.       On September 1, 2010 (the "Petition Date"), the Debtor filed a voluntary petition (the "Chapter 11 Case") for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

6.       The Debtor is operating its business and managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed by the Office of the United States Trustee.

7.       I submit this Declaration in support of the Debtor's voluntary petition for relief under chapter 11 of the Bankruptcy Code and the "first day" motions (the "First Day Motions") of the Debtor filed with the Court contemporaneously herewith. The purpose of this Declaration is to acquaint the Court and other parties in interest with the nature of the Debtor's business, the reasons for the commencement of this chapter 11 case, and the basis for the First Day Motions.

8.       Part I of this Declaration describes the Debtor's corporate history and strategy, corporate structure and business operations. Part II explains the Debtor's prepetition capital structure and indebtedness, along with the circumstances surrounding the commencement of this Chapter 11 Case. Part III describes the Plan (as defined below) and Disclosure Statement that the Debtor will file on or shortly after the Petition Date. Finally, Part IV sets forth the relevant facts in support of the First Day Motions.

## PART I

9.       The Debtor, PPHI, is the holding company for a full-service real estate organization active in acquiring, developing, managing, leasing and selling commercial real estate, including office, apartment, hotel-condominium and industrial properties. Its principal

objective is to achieve long-term value for stockholders through a disciplined approach to investment, development and management. Since its founding in 1968, PPHI has acquired, managed, developed or redeveloped approximately 25 million square feet of class "A" properties.

**Corporate History**

10.     PPHI shares a rich history through its affiliation with the Pitcairn family and The Pitcairn Trust. The Pitcairn family has a remarkable story and tradition dating back several hundred years. In 1775, John Pitcairn's grandfather, a Scottish nobleman fighting in the English army, heard the flash of a musket shot, whirled quickly in that direction, and in that fraction of an instant fired what become known as the "shot heard 'round the world." The United States' War of Independence had begun. Fast forward 100 years, when in 1883, John Pitcairn, who made a name for himself in the railroad business, joined forces with John B. Ford on a new plate-glass factory located in Creighton, Pennsylvania. From that first collaboration grew the Pittsburgh Plate Glass Company, a widely respected global giant.

11.     Future generations continued to add to the family's abounding story. John's youngest son, Harold, continued his family success with his own outstanding achievement. Harold was both practical and philosophical – a lifelong dreamer about flying and machines. He was an outstanding businessman whose achievements in aviation ultimately resulted in the founding of Eastern Airlines. Determined to develop a safe and relatively inexpensive means of air travel, Harold Pitcairn ultimately co-developed an aircraft called the autogiro, which immediately preceded the helicopter.

12.     When industrialist John Pitcairn co-founded Pittsburgh Plate Glass Company in 1883, he laid the groundwork for more than a century of business success. Forty years later, his

3

son Raymond founded the Pitcairn Company, which would soon emerge as a leader in personal wealth management services. In 1968, the Pitcairn Company entered the realm of real estate.

13. During the 1980s, PPHI rose to prominence with the development of a number of class "A" high-rise buildings that became landmarks of the Philadelphia skyline. Its reputation grew as it formed joint ventures with several well-known institutions and developed large tracts of land throughout the greater Philadelphia region into leading suburban office and industrial parks.

14. In 1998, already a successful real estate entrepreneur, I joined PPHI as Chairman and CEO. In addition to overseeing the expansion of key relationships, I have directed its diversification into additional regions and property classes, specifically its focus on growing its residential and office portfolio.

15. PPHI has also emerged as the strategic partner of choice, providing asset management and property management services for our institutional partners, while also serving as the preferred joint-venture operating partner for renowned institutional partners, publicly traded foreign open-end funds, private foreign funds, and domestic real estate investment trusts. And it has aligned itself with such distinctive partners as GE Real Estate, SEB Immobilien Investment, Claret Capital, GMAC, and Lexington Corporate Property Trust, to name a few.

## PPHI's Business Strategy

16. PPHI formulates and carries out its investment, financing and operating strategies around an "operating partner" business model. It identifies acquisition, investment and development opportunities and forms joint ventures with institutional partners through which it and its partners capitalize on the opportunities. Typically, PPHI has invested between 10% and 20% of the equity required by a joint venture, with its partner in the joint venture investing the balance of the required equity. Its joint ventures obtain property-level mortgage financing for

4

projects at loan to value ratios generally ranging between 50% to 75%. PPHI derives revenues from distributions that it receives from its investments in the joint ventures and from "promoted" or "carried" interests that it receives in the joint ventures. In addition, PPHI earns fees from the management services that it provides to the joint ventures and to third party owners of commercial real estate, including fees from property management, asset management and construction management.

17. The Debtor's investment, financing and operating strategies are premised on the application of its extensive management, leasing and operational expertise and experience. PPHI believes this expertise and experience positions it to capitalize on opportunities where value can be created through the repositioning of assets. PPHI also believes that this expertise and experience, coupled with its extensive industry relationships, provides it with opportunities to generate consistent returns, reducing its exposure to market fluctuations and increases in operating costs.

18. As a privately-owned firm, PPHI endeavors to select acquisition, investment and development opportunities with a perspective of achieving long-term value rather than a perspective focused on short-term revenue, net income or cash flows. Historically, the Debtor has reinvested net cash flows into existing projects and new opportunities rather than paying dividends on common stock.

19. Today, PPHI's portfolio includes interests in: (i) an aggregate of approximately 3.5 million square feet of office properties; and (ii) a 168-unit apartment property. In addition, as of December 31, 2009, PPHI owned interests in approximately 193 acres of undeveloped land that it estimates can accommodate up to approximately 5.0 million square feet of new office, apartment, hotel-condominium, and retail projects, subject to our receipt of development permits

YCST01:10113758.1

900002.0001

and entitlements. PPHI also provides a full range of property management services and, as of December 31, 2009, was managing approximately 4.2 million square feet of properties, including approximately 515,000 square feet of properties for third parties.

**Corporate Structure**

20.     PPHI itself is a holding company. It does not itself have any employees or own or lease any property. Rather, PPHI operates primarily through two subsidiaries: Pitcairn Properties, Inc. ("PPI"); and Pitcairn Properties Management Company, LLC ("PPMC"). PPI, a Pennsylvania corporation, is a wholly-owned direct subsidiary of PPHI. PPMC, a Pennsylvania limited liability company, is a wholly-owned direct subsidiary of PPI.

21.     PPI is the primary operating subsidiary of PPHI. It has twenty-four employees which manage the corporate and operational affairs of PPHI and its subsidiaries. PPI owns directly or indirectly the interests in many of the real-estate owning entities in which PPHI has invested. It also provides property, asset and financial management services to these entities.

22.     PPMC is a property manager for many of the real-estate owning entities. It has thirty employees which are assigned to particular properties.

23.     PPHI directly and indirectly owns interests in twenty-seven entities the ("Joint Ventures") that directly own real estate. PPHI owns majority interests in five Joint Ventures that own and operate office or residential properties. It owns minority interests in eleven additional Joint Ventures that own office properties. PPHI, PPI and/or PPMC provide management services for each of these Joint Ventures. In addition, PPHI owns interests in eleven Joint Ventures that own undeveloped real estate.

YCST01:10113758.1                                                        900002.0001

**Business Operations**

24.     PPHI's business operations are divided up into five segments: (1) acquisitions; (2) asset management; (3) development and construction; (4) accounting; and (5) property management.

25.     **Acquisitions.** Utilizing a team of in-house experts and outside consultants, including engineers, architects, environmental engineers, attorneys and accountants, the acquisitions department oversees not only the financial and legal underwriting of a potential acquisition, but also conducts a comprehensive due diligence process on the asset. The result is a thorough understanding of the potential acquisition's characteristics, a complete evaluation of the risks, and a fully developed plan for how the asset will be managed. This acquisition process is more extensive than most due to the attention to detail and creativity that surrounds each purchase. The due diligence must be able to confirm the feasibility of the operating plan that the Debtor desires to implement. The upfront confirmation of the eventual operating plan helps to reduce the risk that the acquisition would ultimately fall short of its projected returns.

26.     **Asset Management.** PPHI's asset management structure assigns individual managers, which possess broad financial and operating level responsibility, to a focused group of properties. Each manager essentially acts as the "owner" of the properties for which they are responsible and is held accountable for every aspect of the investments on which they work. This unique position requires the asset manager to maintain both a "big picture" perspective on each property, while also assuming a "hands-on" approach to day-to-day operating issues and decisions. The asset manager creates property-level strategies required to meet established objectives with a focus on maximizing each property's income, cash flow and long-term value. Each strategic plan is based upon the asset manager's knowledge of both current market conditions and the challenges and opportunities facing the individual property. Each asset

7

manager is responsible for creating and implementing operating, financial and capital budgets, approving property marketing plans and lease transactions, working closely with on-site management personnel to resolve property issues, and monitoring adherence to partnership and loan agreements. The asset manager also oversees the leasing and property management activities at each of their properties.

27. **Development & Construction.** PPHI is experienced in the planning and approval of land for new development as well as the planning, design and construction of new infrastructure and buildings in new developments. Additionally, through its experience in the areas of development and construction of new buildings, major renovations to existing buildings, redevelopment and repositioning of existing buildings and tenant improvement projects, PPHI possesses the expertise both to evaluate technically each potential acquisition and to implement renovations, capital improvements, tenant improvements and other construction projects.

28. **Accounting.** Our accounting department interfaces daily with our asset managers and property managers to assure a comprehensive and current understanding of property-level activities and the impact of these activities on cash flows and financial position. Members of the accounting staff participate in preparation of annual operating plans and budgets for their properties and maintain a reporting system designed to assure optimal support for the reporting requirements for each property. The accounting department coordinates actively with PPHI's on-site management teams to minimize the aging of receivables, while at the same time preserving strong relations with tenants. The accounting department also is proficient in the corporate accounting area and is responsible for complex consolidation accounting, tax preparation and third party audits, among other items.

YCST01:I0113758.1                                                          900002.0001

29.     **Property Management.**  While PPHI's on-site management personnel for each of its properties reports to the respective asset manager, the property management department is responsible for policies and procedures applicable to all of the property managers, as well as for the general training of property managers and staff.  The property management department also oversees complex engineering and design services in special situations that extend beyond regular property management responsibilities.

## Recent Operations

30.     PPHI currently owns and manages over $800 million of Class "A" real estate and has developed over 25 million square feet of Class "A" office space since its inception.  As of December 31, 2009, PPHI reported total assets having a book value of approximately $163 million.  In addition, the company had total revenues in 2009 of $15.8 million, including $12 million of rental revenues and $2.4 million in management fees.  The company has, however, experienced a decline in asset values and revenues as a result of the current depressed state of the real estate market, unavailability of credit, and harsh economic environment.

31.     PPHI is not insolvent.  As of December 31, 2009, the book value of PPHI's assets exceeded its liabilities by approximately $30 million.  Moreover, even using the lowest valuation of the property owned by the Joint Ventures and PPHI's interests therein, the current value of PPHI's assets still exceeds its total liabilities by a wide margin.

**PART II**

## Summary of Prepetition Capital Structure

32.     As of the date of this Declaration, 72,044 shares of common stock are outstanding.

33.     The Debtor  also maintains an employee incentive plan under which it has issued equity-based awards that are referred to as "RSUs," or restricted stock units.  As of the date of

9

this Declaration, an aggregate of 4,372 RSUs are outstanding. An RSU represents a contractual right of the holder of the RSU, an employee or former employee of PPI, to receive a share of common stock upon specified terms and conditions. The incentive plan provides that shares of common stock will be distributed to holders of RSUs upon the occurrence of defined "Liquidation Events," including an IPO of a minimum size or the sale of 50% or more of the voting stock of PPHI. The Debtor does not believe that the Plan (as defined below) will result in a Liquidation Event for the RSUs.

34. On June 24, 2004, Pitcairn Properties issued and sold to PPH Investments, LLC $50,000,000 of Preferred Stock, consisting of 21,645 shares, making it the sole Preferred Stockholder of Pitcairn Properties. The proceeds were used for working capital and general corporate purposes. The Preferred Stock accrues a current quarterly cash dividend and also has certain redemption rights under a Certificate of Designations governing rights and obligations relating to the Preferred Stock. More specifically, PPHI is obligated to redeem the Preferred Stock under certain specified circumstances. The redemption price of the Series A Preferred Stock is approximately $50 million plus the sum of accrued but unpaid dividends, if any. The holder of the Preferred Stock is also entitled to appoint one member of PPHI's board of directors, currently Eric L. Blum ("Blum"). Blum, as principal of PPH Investment Management, LLC, the manager of the Preferred Stockholder, also exercises all rights, authorities and powers of the Preferred Stockholder including the power to bind it. He also has the full and exclusive authority to manage the business of the Preferred Stockholder and is authorized to take all actions with respect to it, including exercising voting and redemption rights and choosing and appointing its representative on PPHI's board of directors.

35.     PPHI is indebted to Wells Fargo Bank, N.A., as successor to Wachovia Bank, N.A. ("Wells Fargo"), pursuant to a letter of credit and related loan agreement with PPI, of which PPHI is a guarantor, and a line of credit to PPHI. PPI and PPHI are in default of these loans because, in late 2009, it was unable to pay the amount drawn on the letter of credit and the principal balance of the loan to PPHI at its maturity. At the time, PPHI had insufficient cash, and could not generate sufficient cash from the sale of real estate interests in a difficult market, to pay the amounts due to Wells Fargo. As of the Petition Date, the outstanding principal amount due to Wells Fargo was approximately $10.3 million, and interest has been paid currently. PPHI's debt to Wells Fargo is secured only by a security interest in a note owed by a shareholder of PPHI, which is of little value.

36.     In addition, the Debtor has an outstanding debt to Daniel Maguire, its former President and Chief Executive Officer, pursuant to a Promissory Note dated May 14, 2003. The Note provides for monthly payments in the amount of approximately $28,000, and has been paid currently. The final payment under the Note will be due in December 2011. The Note is not secured by any lien or other interest in property.

37.     Finally, as noted above, the Joint Ventures each have entity-level financing for their real estate and the development thereof. These obligations are generally secured by mortgages and/or other liens on the property owned by the Joint Ventures. As of December 31, 2009, the total amount of outstanding obligations of the Joint Ventures was $370,775,000. However, only a small portion of this total is guaranteed by PPHI. In addition, PPHI believes that the value of the property subject to mortgages securing the Joint Venture obligations of which PPHI is a guarantor is sufficient to satisfy most or all of the outstanding amount of those obligations.

11

## Circumstances Leading to the Commencement of This Chapter 11 Case

38.     On June 25, 2009, Blum sent a redemption notice to PPHI requesting redemption of the outstanding Preferred Stock.  In accordance with the terms of the Certificate of Designations, the first redemption payment was due June 24, 2010.  PPHI did not—and does not—have "legally available" funds to make the redemption payment and so has not made it. That is in part because, pursuant to the loan agreement between PPI and Wells Fargo, Wells Fargo has insisted that PPHI pay off the entire loan amount before making *any* dividend or redemption payment.[2]  For similar reasons, PPHI informed the Preferred Stockholder on October 2, 2009, that PPHI was experiencing a deteriorating cash flow position due to the challenges presented by the state of the real estate and financing markets, and that PPHI's cash position was insufficient to pay the Preferred Stockholder's quarterly dividend.  PPHI deferred payment of the dividends that were due to the Preferred Stockholder on September 30, 2009, December 31, 2009, March 31, 2010 and June 30, 2010.  As a result, when the first redemption payment was to come due, it included both the base redemption payment and the unpaid dividends.

39.     Based on PPHI's non-payment of the redemption amount, Blum asserted that PPHI was in "Election Default," a circumstance defined in the Certificate of Designations under which the Preferred Stockholder could exercise certain rights.  In a letter dated July 1, 2010, Blum informed PPHI that the Preferred Stockholder "intends to exercise the stacking privilege." The referenced "stacking privilege" (referred to as the "Board Stacking Right") is a right under the Certificate of Designations – exercisable under certain circumstances not then present in this

---

[2]  As a board member, Blum is well-aware of Wachovia's demand.  He is also well aware that the board has adopted a cash management plan designed to allow PPHI, even if the current horrendous real estate market were to remain stagnant, to continue to operate until approximately August 2012.  Indeed, Blum himself requested that PPHI develop the cash management plan.

case – of the Preferred Stockholder to increase the size of PPHI's Board of Directors and appoint new Directors so that the Preferred Stockholder's designees form a majority of the Board.

40.     Pursuant to Blum's reading of the Certificate of Designations, the Preferred Stockholder had the authority to exercise that stacking privilege on August 8, 2010. Regardless of whether its interpretation of the Certificate of Designations is correct, the Preferred Stockholder planned to take control of PPHI's board on the strength of that interpretation. In a letter dated June 22, 2010, Blum informed PPHI that not only did the Preferred Stockholder intend to stack the board but that it will also implement "immediate liquidation of the assets of Pitcairn Properties" once they do.

41.     If the Preferred Stockholder were permitted to exercise the Board Stacking Right, the effect on PPHI's portfolio would be disastrous. PPHI is party to various critical partnership agreements, operating agreements, and loan agreements in connection with the Joint Ventures. Many of these agreements contain change of control provisions that require prior notice and/or approval by the other contracting party should there be a change of control at PPHI. PPHI is also party to several debt agreements whereby a change of control, absent notice and/or prior approval by the lender, would be considered by the lender to be an event of default. It is unlikely that lenders will waive their change of control rights. In the current market, lenders are looking for ways to call loans and bolster their balance sheet tier one capital ratios. A change of control would give the lenders an opportunity to call or renegotiate terms on otherwise conforming loans.

42.     PPHI also has various operating agreements and partnership agreements relating to the Joint Ventures in its real estate portfolio whereby a change of control, absent prior approval by the other partner/member, would be considered an event of default. If the change of

control provisions in these agreements were to be triggered, given the current real estate market, the various contracting partners are likely to take actions which could destroy the viability of PPHI's operations by leaving PPHI with non-performing assets and eliminating a substantial portion of its fee income. These provisions will also allow some of PPHI's partners to exercise buy/sell provisions in the agreements and acquire PPHI's interest in the properties at current, artificially depressed values.

43.    In short, PPHI's partnership, management, and loan agreements with key business partners link PPHI's rights and obligations to structural stability. That structural stability is solid so long as PPHI is not forced to seek alternative financing or liquidation of assets in the current environment of frozen debt markets. A change of control would force the company to seek alternative financing, a near-impossible task in the current market.

44.    If the Preferred Stockholder were to stack the board, friction, dislocation, and diminution in PPHI's value would likely follow. The combination of a disruption of key business partners and lenders and the loss of fee income and asset sales at distressed prices that would follow if the Preferred Stockholder were to stack the board would erode and most likely destroy PPHI's operating platform.

45.    Blum and the Preferred Stockholder are aware of the devastating effect that their stacking the board would have on PPHI's portfolio, but have illustrated time and time again, through Blum who is authorized to make all decisions with respect to the Preferred Stock, that they have little regard for the interests of PPHI as a whole or for its common stockholders. To the contrary, Blum has illustrated by his words and by his actions that if PPHI were to succeed in taking control of the company liquidate Pitcairn Properties' assets would be liquidated by selling them at fire sale prices, thus destroying common stockholder value.

14

46.     The threatened result is not surprising given the pattern of self-dealing and conflict of interest shown by Blum during his tenure on PPHI's board.  Notwithstanding his fiduciary duty of loyalty to PPHI, Blum has repeatedly attempted to purchase all or part of PPHI on terms that would benefit himself, the Preferred Stockholder, or other entities he controls at the expense of the common stockholders of PPHI. He has done this through improperly manipulating his estimates of the value of PPHI and through blatant self-dealing, all with the goal of taking control of PPHI and getting his hands on its valuable real estate portfolio.

47.     In order to avoid the disastrous consequences that would result from the Preferred Stockholder's exercise of the Board Stacking Rights, PPHI and PPI filed an action in the Delaware Court of Chancery against Blum, the Preferred Stockholder and other related entities on July 20, 2010.  In this action, PPHI sought, among other things, a temporary restraining order and a preliminary injunction barring the Preferred Stockholder from exercising the Board Stacking Right.  After a preliminary hearing on July 23, 2010, the Vice Chancellor entered an order scheduling a hearing on the request for a preliminary injunction on September 3, 2010, and barring the Preferred Stockholder from the Board Stacking Right until that request is decided.

48.     Notwithstanding the hearing scheduled for September 3, 2010, in the exercise of their fiduciary duties, the Board of Directors of PPHI determined that the Debtor could not face the risk that the Vice Chancellor might deny the requested preliminary injunction and allow the Preferred Stockholder to exercise the Board Stacking Right immediately.  Even though the Board was confident of PPHI's position that the Preferred Stockholder did not have the power to exercise that right, the catastrophic consequences that would come about if the Vice Chancellor disagreed with the PPHI's position were too great.  Accordingly, the Board determined that PPHI

should file a voluntary petition under the Bankruptcy Code in order to protect the company and its assets for the benefit of its creditors and equity interest holders.

## PART III

49.     On or shortly after the Petition Date, the Debtor will file a proposed Plan of Reorganization (the "Plan") and proposed Disclosure Statement. The Debtor intends to seek approval from this Court of the Disclosure Statement and then the Plan as promptly as possible.

50.     The Plan will provide generally for the payment of all claims in full, with interest, over specified periods of time. Other than the accrued dividends owed to the holders of Preferred Stock Interests, all non-contingent unsecured claims will be paid in full, with interest, on or before June 30, 2011.

51.     The accrued dividends will be paid in full, with interest, within two years. The balance of the redemption price (that is, other than the accrued dividends) owed to the holders of Preferred Stock will be paid in full within five years, with interest.

52.     The holders of Common Stock and Restricted Stock Units will retain their existing interests in PPHI.

53.     The Debtor believes that the Disclosure Statement sets forth adequate information concerning the Plan.

54.     In addition, the Debtor will file a Motion for Entry of an Order (I) Approving the Disclosure Statement; (II) Establishing Plan Solicitation, Voting and Tabulation Procedures; and (III) Scheduling a Hearing and Establishing Notice and Objection Procedures for Confirmation of the Debtor's Plan Of Reorganization (the "Disclosure Statement Motion"). This Motion will seek approval of solicitation and voting materials and scheduling of a confirmation hearing in accordance with the Bankruptcy Code and Bankruptcy Rules in order to obtain prompt confirmation of the Plan. The Debtor intends to ask the Court to schedule a hearing as soon as

16

possible under the applicable Bankruptcy Rules on the Disclosure Statement Motion and the Disclosure Statement.

55.     The Debtor will also file shortly a Motion for an Order Pursuant to Bankruptcy Rule 3003(C)(3) Setting a Final Date for Filing Pre-Petition Proofs of Claim Against the Debtor and Approving Notice Thereof (the "Bar Date Motion"). The Debtor intends to file the Bar Date Motion in order to set a Bar Date as soon as possible to allow the Debtor to determine definitively the scope of claims and interests asserted against the Debtor that will need to be resolved under the Plan. The Debtor intends to ask the Court to schedule a hearing as soon as possible under the applicable Bankruptcy Rules on the Bar Date Motion.

## PART IV

56.     Contemporaneously with the filing of this Chapter 11 Case, the Debtor has filed a Motion for an Order (I) Approving Continued Use of Cash Management System, (II) Authorizing Waiver of Certain Bank Account and Related Requirements of the Office of the United States Trustee for the District of Delaware, and (III) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis (the "Cash Management Motion").

57.     I have reviewed the Cash Management Motion, including the exhibits thereto, and believe that the relief requested therein is critical to the Company's ability to achieve a successful reorganization.

58.     Factual information with respect to the Cash Management Motion is provided therein, and I affirm that the statements and allegations contained in the Cash Management Motion are true to the best of my knowledge, information and belief.

59.     The Debtor believes, and I agree, that approval of the Cash Management Motion is an important element of the Debtor's reorganization efforts, and is necessary to ensure a smooth transition into chapter 11 with minimal disruption to its operations.

17

I declare under penalty of perjury of the law of the United States of America that the foregoing Declaration of Salah A. Mekkawy in Support of First Day Motions is true and correct to the best of my knowledge and belief.

Executed this 1st day of September, 2010, at Jenkintown, Pennsylvania.

_____
Salah A. Mekkawy