# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **PITCAIRN PROPERTIES HOLDINGS, INC.**[1] | **Case No. 10-12764 (PJW)** |
| Debtor. | |

## DISCLOSURE STATEMENT WITH RESPECT
## TO DEBTOR'S PLAN OF REORGANIZATION OF

**NOTE:** THE DEBTOR BELIEVES THAT ACCEPTANCE OF THE PLAN DESCRIBED IN THIS DOCUMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATE, CREDITORS AND OTHER PARTIES IN INTEREST. ACCORDINGLY, THE DEBTOR RECCOMENDS THAT YOU **VOTE IN FAVOR OF THE PLAN**.

THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS PROPOSED DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.[2]

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
Robert F. Poppiti, Jr. (No. 5052)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

HANGLEY ARONCHICK SEGAL & PUDLIN
James M. Matour (pro hac vice admission pending)
Matthew A. Hamermesh (pro hac vice admission pen
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200 (phone)
(215) 568-0300 (fax)

PROPOSED ATTORNEYS FOR DEBTOR
AND DEBTOR-IN-POSSESSION

---

[1] The last four digits of the Debtor's federal tax identification number are 3452. The Debtor's address is One Pitcairn Place, 165 Township Line Road, Suite 1500, Jenkintown, PA 19046-3599.

[2] Legend to be removed upon entry of the Disclosure Statement Order by the Bankruptcy Court.

**PRELIMINARY STATEMENT**

PURSUANT TO SECTION 1128 OF THE BANKRUPTCY CODE, A CONFIRMATION HEARING WILL BE HELD WITH RESPECT TO THE DEBTOR'S PLAN OF REORGANIZATION (AS AMENDED FROM TIME TO TIME, INCLUDING, WITHOUT LIMITATION, ALL ADDENDA, EXHIBITS, SCHEDULES AND OTHER ATTACHEMENTS THERETO, THE "PLAN") ON [_____], 2010, AT [_____] [A.M.][P.M.] (PREVAILING EASTERN TIME), BEFORE THE HONORABLE PETER J. WALSH, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 6TH FLOOR, COURTROOM #2, WILMINGTON, DELAWARE 19801 (THE "CONFIRMATION HEARING"). OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [_____], 2010 AT 4:00 P.M. (PREVAILING EASTERN TIME). THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT MADE AT THE CONFIRMATION HEARING OR AT ANY SUBSEQUENT ADJOURNED DATE OF THE CONFIRMATION HEARING OR A FILING BY THE DEBTOR ON THE DOCKET OF THE CASE OF THE DATE AND TIME TO WHICH THE CONFIRMATION HEARING HAS BEEN ADJOURNED.

THIS DISCLOSURE STATEMENT (INCLUDING ALL AMENDMENTS, MODIFICATIONS, SUPPLEMENTS AND EXHIBITS HERETO, THE "DISCLOSURE STATEMENT") IS BEING DISTRIBUTED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN.

THE DEBTOR INTENDS TO SEEK TO CONFIRM THE PLAN AND TO CAUSE THE EFFECTIVE DATE OF THE PLAN TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN.  HOWEVER, THERE CAN BE NO ASSURANCE AS TO WHETHER OR WHEN THE CONFIRMATION OR THE EFFECTIVE DATE OF THE PLAN ACTUALLY WILL OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER REVIEWED NOR APPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS  CONTAINED HEREIN. THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

A COPY OF THE PLAN IS ATTACHED AS EXHIBIT A HERETO. ALL HOLDERS OF CLAIMS AGAINST OR EQUITY INTEREST IN THE DEBTOR ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. UNLESS

OTHERWISE SPECIFIED HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN. **THE DEBTOR ASSUMES NO DUTY TO UPDATE OR SUPPLEMENT THE DISCLOSURES CONTAINED HEREIN AND DOES NOT INTEND TO UPDATE OR SUPPLEMENT THE DISCLOSURES, EXCEPT TO THE EXTENT, IF ANY, NECESSARY AT THE HEARING ON CONFIRMATION OF THE PLAN.**

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR. YOU ARE ADVISED TO OBTAIN INDEPENDENT EXPERT ADVICE ON SUCH SUBJECTS.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

    A.    About This Disclosure Statement ................................................... 1

    B.    Plan ................................................................................................ 2

    C.    Terminology.................................................................................... 2

    D.    Notice of Hearing........................................................................... 3

    E.    Voting Procedure ........................................................................... 3

    F.    Proofs of Claim and Interests and Requests ................................. 4

II.    PITCAIRN PROPERTIES HOLDINGS, INC. ................................................. 5

    A.    Corporate History........................................................................... 5

    B.    The Debtor's Business Strategy..................................................... 6

    C.    Corporate Structure ....................................................................... 7

    D.    Business Operations....................................................................... 7

    E.    Capital Structure and Outstanding Debts...................................... 9

    F.    Recent Operations ....................................................................... 10

III.    OVERVEIW OF THE BANKRUPTCY CASE ............................................. 10

    A.    PPHI's Dispute with the Preferred Stockholder and the Need to File a Bankruptcy Case................................................................................................... 10

    B.    The Chapter 11 Proceeding is Filed ........................................... 12

    C.    Overall Financial Obligations ..................................................... 13

IV.    OVERVIEW OF THE PLAN ......................................................................... 14

    A.    Purposes of the Plan.................................................................... 14

    B.    The Chapter 11 Process ............................................................... 14

    C.    Classification................................................................................ 14

    D.    General Outline Of The Plan ....................................................... 15

    E.    Funding of the Plan and Reorganized PPHI ............................... 17

    F.    Plan Confirmation........................................................................ 17

V.    EXECUTORY CONTRACTS.......................................................................... 18

VI.    POST-REORGANIZATION MANAGEMENT .............................................. 18

VII.    ALTERNATIVES TO REORGANIZATION .................................................. 18

    A.    Alternative Chapter 11 Plan........................................................ 18

B.      Sale of the Debtor. ............................................................................................ 19

C.      Chapter 11 Liquidation ....................................................................................... 19

D.      Chapter 7 Liquidation ......................................................................................... 19

E.      Liquidation Analysis ........................................................................................... 20

VIII.      RISK FACTORS ......................................................................................................... 20

A.      Non-Confirmation ............................................................................................... 20

B.      Non-Consummation ............................................................................................ 21

C.      Business Risk ...................................................................................................... 21

D.      Other Risks.......................................................................................................... 21

IX.      LIMITATIONS ON LIABILITY ............................................................................... 21

X.      MISCELLANEOUS PROVISIONS............................................................................ 22

A.      Plan Modifications and Retention of Jurisdiction.............................................. 22

B.      Causes of Action ................................................................................................. 24

C.      The Effective Date and Conditions Precedent to Consummation ....................... 24

D.      Federal Income Tax Consequences of the Plan ................................................... 25

XI.      CONCLUSION............................................................................................................. 25

**EXHIBITS**

Exhibit A – Debtor's Plan of Reorganization

# I.  INTRODUCTION

## A.  About This Disclosure Statement

This document is a disclosure statement, and it has been prepared in connection with the Plan of Reorganization of Pitcairn Properties Holdings, Inc. ("PPHI" or the "Debtor") filed on September ___, 2010, in its pending case under Chapter 11 of the United States Bankruptcy Code (the "Code" or the "Bankruptcy Code").  The purpose of a disclosure statement is to provide information to the creditors and equity interest holders in a Chapter 11 case so that they may make informed judgments in voting on a plan of reorganization.

Disclosure statements can be of many different styles depending on the nature and sophistication of the creditors and equity interest holders and the complexity of a reorganization plan.  This Disclosure Statement has been prepared on the assumption that the majority of creditors and holders of equity interests in this case are not familiar with the technical provisions of the Bankruptcy Code.  To the extent possible, the Debtor has attempted to use plain English and avoid technical terminology.  Capitalized terms not defined herein have the meaning set forth in the Plan or in the Bankruptcy Code.

This Disclosure Statement is organized into several parts which cover in a general way the history of PPHI and this Chapter 11 case, the contents of the Plan, the distribution mechanisms, and the principal risks and alternatives to the Plan as proposed.

On _____, 2010, the Bankruptcy Court reviewed this Disclosure Statement and entered an order determining that this document contains "adequate information."  This order does not mean that the Bankruptcy Court has approved the Plan or endorsed the Disclosure Statement.  It simply means that the Bankruptcy Court has determined that this document contains enough information so that Creditors and holders of Interests can meaningfully evaluate the Plan.  Only after voting is complete will the Bankruptcy Court consider the Plan and determine whether it should be "confirmed," that is to say, adopted.

This Disclosure Statement contains a summary of certain provisions of the Plan and transactions contemplated under the Plan.  Although PPHI believes that the summary is fair and accurate, this summary is qualified to the extent it does not set forth the entire text of the Plan.  All holders of Claims and Interests are encouraged to read the Plan and any related documents in their entirety.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified.  Neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with this Disclosure Statement or the Plan will, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date hereof.  **The Debtor assumes no duty to update or supplement the disclosures contained herein and does not intend to update or supplement the disclosures, except to the extent, if any, necessary at the hearing on confirmation of the Plan.**  As to contested matters, adversary proceedings and other actions or threatened actions, the Disclosure Statement will not constitute or be construed as an admission of any fact or liability, stipulation or waiver, but rather as a statement made in settlement negotiations.

This Disclosure Statement will not be admissible in any proceeding involving PPHI or Reorganized PPHI, or any other party in interest, nor shall it be deemed an admission by any party or person, except in connection with its approval under Section 1125 of the Bankruptcy Code and the confirmation process for the Plan, nor will it be construed to be conclusive advice on tax, securities or other legal effects as to any party.

You are encouraged to consult with your lawyers and other advisors as you consider this Disclosure Statement and the Plan. Inquiries concerning this Disclosure Statement or the Plan may be directed to:

James M. Matour, Esquire
Matthew A. Hamermesh, Esquire
Hangley Aronchick Segal & Pudlin
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200

Messrs. Matour and Hamermesh are the lawyers who represent PPHI in this Chapter 11 case.

### B.  Plan

This Disclosure Statement accompanies the Plan of Reorganization that provides for continuation of PPHI in business and the restructuring of PPHI's debt and equity. The Plan is the product of negotiations between PPHI and certain of its creditors and equity interest holders.

### C.  Terminology

As you review this Disclosure Statement, you will notice that a variety of the names and terms are capitalized and shortened. Some of these terms are defined in this Disclosure Statement. Others are defined in the Plan or the Bankruptcy Code. Article I of the Plan contains a set of definitions to which you may wish to refer from time to time.

Several of the terms used in this Disclosure Statement are worthy of particular attention. "Confirmation" of a plan of reorganization means adoption of a plan by the Bankruptcy Court. The "Confirmation Date" is the date on which the Bankruptcy Court issues its order approving a plan. "Consummation" of a plan is the process by which a confirmed plan is effectuated. The "Effective Date" is the date on which the Plan takes effect. A plan must be confirmed before it may be consummated.

The following defined terms are used repeatedly in this Disclosure Statement. In order to aid your review, a short glossary follows:

| | | |
|---|---|---|
| "Disclosure Statement" | - | This Disclosure Statement and all amendments, modifications, supplements and exhibits hereto |

| "PPHI" or the "Debtor" | - | Pitcairn Properties Holdings, Inc., a Delaware corporation and the debtor and debtor-in-possession in this case |
| "Plan" | - | The Debtor's Plan of Reorganization, dated September__, 2010, attached hereto as Exhibit A, as amended from time to time, including, without limitation, all addenda, exhibits, schedules and other attachements thereto |
| "Reorganized PPHI" | - | PPHI from and after the Effective Date of the Plan |

### D.    Notice of Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for _____, 2010, at _____ ___.m. (prevailing Eastern Time) before the Honorable Peter J. Walsh, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom #2, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time with notice only to those who have filed a timely objection or response to the Plan.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement made at the Confirmation Hearing or at any subsequent adjourned date of the Confirmation Hearing or a filing by the Debtor on the docket of the Case of the date and time to which the Confirmation Hearing has been adjourned.

Any creditor or party-in-interest who wishes to object to Confirmation of the Plan must file, on or before 4:00 p.m. on _____, 2010 (prevailing Eastern Time), a written objection or response with the Bankruptcy Court and at the same time serve such written objection or response on (i) Hangley Aronchick Segal & Pudlin, One Logan Square, 27th Floor, Philadelphia, PA 19103, Attn: James M. Matour, Esquire and Matthew A. Hamermesh, Esquire and (ii) Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware, Attn: James L. Patton, Jr. and Robert F. Poppiti, Jr., counsel to the Debtor.  Any objection or response must be written and timely filed and served in order to enable the Creditor or party-in-interest to be heard at the Confirmation Hearing.

### E.    Voting Procedure

Accompanying this Disclosure Statement, Creditors and holders of Interests entitled to vote on the Plan will find a Ballot.  Please fill out the Ballot, execute it, and return it to the following address in the enclosed envelope:

PITCAIRN PROPERTIES HOLDINGS, INC. PLAN VOTING
c/o Matthew A. Hamermesh
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square, 27th Floor
Philadelphia, PA 19103

The requirements for confirmation of a Chapter 11 plan of reorganization are set forth in detail in Section 1129 of the Bankruptcy Code. Except to the extent that the "cram down" provisions of Section 1129(b) of the Bankruptcy Code will be invoked (as necessary to confirm the Plan over the deemed rejection of the Plan by any impaired Class), each class of Claims or Interests that is impaired by a plan must either vote to accept the plan or be deemed to have accepted the plan. Voting is a crucial part of the bankruptcy process.

Classes 1, 5 and 7 are not impaired by the Plan. Pursuant to Section 1126(f) of the Bankruptcy Code, the holders of Claims in such classes are conclusively presumed to have voted to accept the Plan, and, accordingly, the votes of such holders will not be solicited. Classes 2, 3, 4 and 6 are impaired by the Plan. The holders of Allowed Claims in Classes 2, 3, 4 and 6 will be entitled to vote to accept or reject the Plan.

Regardless of how you cast your Ballot, we urge that you vote on the Plan. Under the Bankruptcy Code, an impaired Class of Creditors is determined to have accepted a plan if affirmative votes are cast by more than half (50%) of the voting Creditors in such Class collectively holding more than two-thirds (66.67%) in amount of the voting Claims in such Class. These calculations are based on the number and claim amounts of class members which actually vote on the Plan. For this reason, your vote is very important.

If any holder of record is not also the beneficial holder of such Claim, the vote to accept or reject the Plan must be cast by the beneficial owner.

**BALLOTS MUST BE RECEIVED ON OR BEFORE 4:00 P.M. (PREVAILING EASTERN TIME) ON _____, 2010, TO BE COUNTED IN THE VOTING. BALLOTS RECEIVED AFTER THIS TIME WILL NOT BE OPENED OR COUNTED IN THE VOTING UNLESS THE COURT SO ORDERS. BALLOTS SUBMITTED BY FACSIMILE, EMAIL OR OTHER FORM OF ELECTRONIC TRANSMISSION WILL NOT BE ACCEPTED OR COUNTED, EXCEPT IN THE DEBTOR'S SOLE DISCRETION.**

**F.     Proofs of Claim and Interests and Requests**

The last date (the "Bar Date") for filing proofs of claim or interests on account of pre-petition obligations and equity interests (other than on behalf of Governmental Units, as such term is defined in Section 101(27) of the Bankruptcy Code) will be _____, 2010. Under the Bankruptcy Code, any holder of a Claim or Interest that did not timely file a proof of such Claim or Interest by the Bar Date is barred from participating in the Plan or obtaining a Distribution thereunder, unless the Claim or Interest was listed on the Schedules, Statement of Financial Affairs or List of Equity Security Holders filed by PPHI on _____, 2010, as amended from time to time thereafter, and not listed therein as disputed, contingent or unliquidated.

The last date for filing Requests on account of obligations arising on or after the Petition Date, but prior to the Effective Date, and which are entitled to priority as administrative expenses under Section 503 of the Bankruptcy Code — other than (i) tax liabilities; (ii) non-tax liabilities incurred by PPHI in the ordinary course of business; or (iii) fees and expenses incurred by

Professionals retained in this proceeding or expenses incurred by Committee members acting in such capacity during this proceeding — shall be thirty (30) days after the Effective Date. All Requests for payment of administrative expenses arising on or after the Petition Date, but prior to the Effective Date, that are not filed within thirty (30) days of the Effective Date, other than those specified above, will be forever barred, released and discharged. In addition, any holder of an Administrative Expense — other than one of the types described above — arising on or after the Petition Date that does not timely file a Request within thirty (30) days of the Effective Date will be forever barred and estopped from participating in the Plan or obtaining any Distribution on account of such Administrative Expense.

Negotiations among PPHI and certain of its creditors and equity interest holders have culminated in this proposed Disclosure Statement and Plan. PPHI is seeking acceptances of the Plan from holders of Claims and Interests that are impaired under the Plan. This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and other information regarding PPHI. **All holders of Claims and Interests are encouraged to read the Disclosure Statement and Plan in their entirety before deciding to vote either to accept or reject the Plan.**

## II.     PITCAIRN PROPERTIES HOLDINGS, INC.

The Debtor, PPHI, is the holding company for a full-service real estate organization active in acquiring, developing, managing, leasing and selling commercial real estate, including office, apartment, hotel-condominium and industrial properties. Its principal objective is to achieve long-term value for stockholders through a disciplined approach to investment, development and management. Since its founding in 1968, PPHI has acquired, managed, developed or redeveloped approximately 25 million square feet of class "A" properties.

### A.     <u>Corporate History</u>

PPHI shares a rich history through its affiliation with the Pitcairn family and The Pitcairn Trust. The Pitcairn family has a remarkable story and tradition dating back several hundred years. In 1775, John Pitcairn's grandfather, a Scottish nobleman fighting in the English army, heard the flash of a musket shot, whirled quickly in that direction, and in that fraction of an instant fired what become known as the "shot heard 'round the world." The United States' War of Independence had begun. Fast forward 100 years, when in 1883, John Pitcairn, who made a name for himself in the railroad business, joined forces with John B. Ford on a new plate-glass factory located in Creighton, Pennsylvania. From that first collaboration grew the Pittsburgh Plate Glass Company, a widely respected global giant.

Future generations continued to add to the family's abounding story. John's youngest son, Harold, continued his family success with his own outstanding achievement. Harold was both practical and philosophical – a lifelong dreamer about flying and machines. He was an outstanding businessman whose achievements in aviation ultimately resulted in the founding of Eastern Airlines. Determined to develop a safe and relatively inexpensive means of air travel, Harold Pitcairn ultimately co-developed an aircraft called the autogiro, which immediately preceded the helicopter.

When industrialist John Pitcairn co-founded Pittsburgh Plate Glass Company in 1883, he laid the groundwork for more than a century of business success.  Forty years later, his son Raymond founded the Pitcairn Company, which would soon emerge as a leader in personal wealth management services.  In 1968, the Pitcairn Company entered the realm of real estate.

During the 1980s, PPHI rose to prominence with the development of a number of class "A" high-rise buildings that became landmarks of the Philadelphia skyline. Its reputation grew as it formed joint ventures with several well-known institutions and developed large tracts of land throughout the greater Philadelphia region into leading suburban office and industrial parks.

In 1998, Mr. Salah Mekkawy, a successful real estate entrepreneur, joined PPHI as Chairman and CEO. In addition to overseeing the expansion of key relationships, Mr. Mekkawy has directed its diversification into additional regions and property classes, specifically its focus on growing its residential and office portfolio.

PPHI has also emerged as the strategic partner of choice, providing asset management and property management services for our institutional partners while also serving as the preferred joint-venture operating partner for renowned institutional partners, publicly traded foreign open-end funds, private foreign funds, and domestic real estate investment trusts. And it has aligned itself with such distinctive partners as GE Real Estate, SEB Immobilien Investment, Claret Capital, GMAC, and Lexington Corporate Property Trust to name a few.

### B.      The Debtor's Business Strategy

PPHI formulates and carries out its investment, financing and operating strategies around an "operating partner" business model: it identifies acquisition, investment and development opportunities and forms joint ventures with institutional partners through which it and its partners capitalize on the opportunities.  Typically, PPHI has invested between 10% and 20% of the equity required by a joint venture, with its partner in the joint venture investing the balance of the required equity.  Its joint ventures obtain property-level mortgage financing for projects at loan to value ratios generally ranging between 50% to 75%.  PPHI derives revenues from distributions that it receives from its investments in the joint ventures and from "promoted" or "carried" interests that it receives in the joint ventures.  In addition, PPHI earns fees from the management services that it provides to the joint ventures and to third party owners of commercial real estate, including fees from property management, asset management and construction management.

The Debtor's investment, financing and operating strategies are premised on the application of its extensive management, leasing and operational expertise and experience.  PPHI believes this expertise and experience positions it to capitalize on opportunities where value can be created through the repositioning of assets.  PPHI also believes that this expertise and experience, coupled with its extensive industry relationships, provides it with opportunities to generate consistent returns, reducing its exposure to market fluctuations and increases in operating costs.

As a privately-owned firm, PPHI endeavors to select acquisition, investment and development opportunities with a perspective of achieving long-term value rather than a

perspective focused on short-term revenue, net income or cash flows.  Historically, the Debtor has reinvested net cash flows into existing projects and new opportunities rather than paying dividends on common stock.

Today PPHI's portfolio includes interests in: (i) an aggregate of approximately 3.5 million square feet of office properties and (ii) a 168-unit apartment property.  In addition, as of December 31, 2009, PPHI owned interests in approximately 193 acres of undeveloped land that it estimates can accommodate up to approximately 5.0 million square feet of new office, apartment, hotel-condominium, and retail projects, subject to our receipt of development permits and entitlements.  PPHI also provides a full range of property management services and, as of December 31, 2009, was managing approximately 4.2 million square feet of properties, including approximately 515,000 square feet of properties for third parties.

## C.     Corporate Structure

PPHI itself is a holding company.  It does not itself have any employees or own or lease any property.  Rather, PPHI operates primarily through two subsidiaries: Pitcairn Properties, Inc. ("PPI") and Pitcairn Properties Management Company, LLC ("PPMC").  PPI, a Pennsylvania corporation, is a wholly-owned direct subsidiary of PPHI.  PPMC, a Pennsylvania limited liability company, is a wholly-owned direct subsidiary of PPI.

PPI is the primary operating subsidiary of PPHI.  It has twenty-four employees who manage the corporate and operational affairs of PPHI and its subsidiaries.  PPI owns directly or indirectly the interests in many of the real-estate owning entities in which PPHI has invested.  It also provides property, asset and financial management services to these entities.

PPMC is a property manager for many of the real-estate owning entities.  It has thirty employees who are assigned to particular properties.

PPHI directly and indirectly owns interests in twenty-seven entities the ("Joint Ventures") that directly own real estate.  PPHI owns majority interests in five Joint Ventures that own and operate office or residential properties.  It owns minority interests in eleven additional Joint Ventures that own office properties.  PPHI, PPI and/or PPMC provide management services for each of these Joint Ventures.  In addition, PPHI owns interests in eleven Joint Ventures that own undeveloped real estate.

## D.     Business Operations

PPHI's business operations are divided up into five segments:  (1) acquisitions, (2) asset management, (3) development and construction, (4) accounting, and (5) property management.

**Acquisitions.**  Utilizing a team of in-house experts and outside consultants including engineers, architects, environmental engineers, attorneys and accountants, the acquisitions department oversees not only the financial and legal underwriting of a potential acquisition, but also conducts a comprehensive due diligence process on the asset.  The result is a thorough understanding of the potential acquisition's characteristics, a complete evaluation of the risks, and a fully developed plan for how the asset will be managed.  This acquisition process is more extensive than most due to the attention to detail and creativity that surrounds each purchase.

The due diligence must be able to confirm the feasibility of the operating plan that the Debtor desires to implement. The upfront confirmation of the eventual operating plan helps to reduce the risk that the acquisition would ultimately fall short of its projected returns.

**Asset Management.** PPHI's asset management structure assigns individual managers, who possess broad financial and operating level responsibility, to a focused group of properties. Each manager essentially acts as the "owner" of the properties for which they are responsible and is held accountable for every aspect of the investments on which they work. This unique position requires the asset manager to maintain both a "big picture" perspective on each property, while also assuming a "hands-on" approach to day-to-day operating issues and decisions. The asset manager creates property-level strategies required to meet established objectives with a focus on maximizing each property's income, cash flow and long-term value. Each strategic plan is based upon the asset manager's knowledge of both current market conditions and the challenges and opportunities facing the individual property. Each asset manager is responsible for creating and implementing operating, financial and capital budgets, approving property marketing plans and lease transactions, working closely with on-site management personnel to resolve property issues, and monitoring adherence to partnership and loan agreements. The asset manager also oversees the leasing and property management activities at each of their properties.

**Development & Construction.** PPHI is experienced in the planning and approval of land for new development as well as the planning, design and construction of new infrastructure and buildings in new developments. Additionally, through its experience in the areas of development and construction of new buildings, major renovations to existing buildings, redevelopment and repositioning of existing buildings and tenant improvement projects, PPHI possesses the expertise both to evaluate technically each potential acquisition and to implement renovations, capital improvements, tenant improvements and other construction projects.

**Accounting.** Our accounting department interfaces daily with our asset managers and property managers to assure a comprehensive and current understanding of property-level activities and the impact of these activities on cash flows and financial position. Members of the accounting staff participate in preparation of annual operating plans and budgets for their properties and maintain a reporting system designed to assure optimal support for the reporting requirements for each property. The accounting department coordinates actively with PPHI's on-site management teams to minimize the aging of receivables, while at the same time preserving strong relations with tenants. The accounting department also is proficient in the corporate accounting area and is responsible for complex consolidation accounting, tax preparation and third party audits, among other items.

**Property Management.** While PPHI's on-site management personnel for each of its properties reports to the respective asset manager, the property management department is responsible for policies and procedures applicable to all of the property managers, as well as for the general training of property managers and staff. The property management department also oversees complex engineering and design services in special situations that extend beyond regular property management responsibilities.

### E.     Capital Structure and Outstanding Debts

As of the date of this Disclosure Statement, 72,044 shares of common stock are outstanding.

The Debtor also maintains an employee incentive plan under which it has issued equity-based awards that are referred to as "RSUs", or restricted stock units. As of the date of this Disclosure Statement, an aggregate of 4,372 RSUs are outstanding. An RSU represents a contractual right of the holder of the RSU, an employee or former employee of PPI, to receive a share of common stock upon specified terms and conditions. The incentive plan provides that shares of common stock will be distributed to holders of RSUs upon the occurrence of defined "Liquidation Events," including an IPO of a minimum size or the sale of 50% or more of the voting stock of PPHI. The Debtor does not believe that the Plan will result in a Liquidation Event for the RSUs.

On June 24, 2004, Pitcairn Properties issued and sold to PPH Investments, LLC $50,000,000 of Preferred Stock, consisting of 21,645 shares, making it the sole Preferred Stockholder of Pitcairn Properties. The proceeds were used for working capital and general corporate purposes. The Preferred Stock accrues a current quarterly cash dividend and also has certain redemption rights under a Certificate of Designations governing rights and obligations relating to the Preferred Stock. More specifically, PPHI is obligated to redeem the Preferred Stock under certain specified circumstances. The redemption price of the Series A Preferred Stock is approximately $50 million plus the sum of accrued but unpaid dividends, if any. The holder of the Preferred Stock is also entitled to appoint one member of PPHI's board of directors, currently Eric L. Blum ("Blum"). Blum, as principal of PPH Investment Management, LLC, the manager of the Preferred Stockholder, also exercises all rights, authorities and powers of the Preferred Stockholder including the power to bind it. He also has the full and exclusive authority to manage the business of the Preferred Stockholder and is authorized to take all actions with respect to it, including exercising voting and redemption rights and choosing and appointing its representative on PPHI's board of directors.

PPHI is indebted to Wells Fargo Bank, N.A., as successor to Wachovia Bank, N.A. ("Wells Fargo"), pursuant to a letter of credit and related loan agreement with PPI, of which PPHI is a guarantor, and a line of credit to PPHI. PPI and PPHI are in default of these loans because, in late 2009, it was unable to pay the amount drawn on the letter of credit and the principal balance of the loan to PPHI at its maturity. At the time, PPHI had insufficient cash, and could not generate sufficient cash from the sale of real estate interests in a difficult market, to pay the amounts due to Wells Fargo. As of the Petition Date, the outstanding principal amount due to Wells Fargo was approximately $10.3 million, and interest has been paid currently. PPHI's debt to Wells Fargo is secured only by a security interest in a note owed by a shareholder of PPHI, which is of little value.

In addition, the Debtor has an outstanding debt to Daniel Maguire, its former President and Chief Executive Officer, pursuant to a Promissory Note dated May 14, 2003. The Note provides for monthly payments in the amount of approximately $28,000, and has been paid currently. The final payment under the Note will be due in December 2011. The Note is not secured by any lien or other interest in property.

Finally, as noted above, the Joint Ventures each have entity-level financing for their real estate and the development thereof. These obligations are generally secured by mortgages and/or other liens on the property owned by the Joint Ventures. As of December 31, 2009, the total amount of outstanding obligations of the Joint Ventures was $370,775,000. However, only a small portion of this total is guaranteed by PPHI. In addition, PPHI believes that the value of the property subject to mortgages securing the Joint Venture obligations of which PPHI is a guarantor is sufficient to satisfy most or all of the outstanding amount of those obligations.

F.    **Recent Operations**

PPHI currently owns and manages over $800 million of Class "A" real estate and has developed over 25 million square feet of Class "A" office space since its inception. As of December 31, 2009, PPHI reported total assets having a book value of approximately $163 million. In addition, the company had total revenues in 2009 of $15.8 million, including $12 million of rental revenues and $2.4 million in management fees. The company has, however, experienced a decline in asset values and revenues as a result of the current depressed state of the real estate market, unavailability of credit, and harsh economic environment.

PPHI is not insolvent. As of December 31, 2009, the book value of PPHI's assets exceeded its liabilities by approximately $30 million. Moreover, even using the lowest valuation of the property owned by the Joint Ventures and PPHI's interests therein, the current value of PPHI's assets still exceeds its total liabilities by a wide margin.

III.  **OVERVEIW OF THE BANKRUPTCY CASE**

A.    **PPHI's Dispute with the Preferred Stockholder and the Need to File a Bankruptcy Case**

On June 25, 2009, Blum sent a redemption notice to PPHI requesting redemption of the outstanding Preferred Stock. In accordance with the terms of the Certificate of Designations, the first redemption payment was due June 24, 2010. PPHI did not — and does not—have "legally available" funds to make the redemption payment and so has not made it. That is in part because, pursuant to the loan agreement between PPI and Wells Fargo, Wells Fargo has insisted that PPHI pay off the entire loan amount before making *any* dividend or redemption payment.[3] For similar reasons, PPHI informed the Preferred Stockholder on October 2, 2009, that PPHI was experiencing a deteriorating cash flow position due to the challenges presented by the state of the real estate and financing markets, and that PPHI's cash position was insufficient to pay the Preferred Stockholder's quarterly dividend. PPHI deferred payment of the dividends that were due to the Preferred Stockholder on September 30, 2009, December 31, 2009, March 31, 2010 and June 30, 2010. As a result, when the first redemption payment was to come due, it included both the base redemption payment and the unpaid dividends.

---

[3] As a board member, Blum is well-aware of Wachovia's demand. He is also well aware that the board has adopted a cash management plan designed to allow PPHI, even if the current horrendous real estate market were to remain stagnant, to continue to operate until approximately August 2012. Indeed, Blum himself requested that PPHI develop the cash management plan.

Based on PPHI's non-payment of the redemption amount, Blum asserted that PPHI was in "Election Default," a circumstance defined in the Certificate of Designations under which the Preferred Stockholder could exercise certain rights. In a letter dated July 1, 2010, Blum informed PPHI that the Preferred Stockholder "intends to exercise the stacking privilege." The referenced "stacking privilege" (referred to as the "Board Stacking Right") is a right under the Certificate of Designations – exercisable under certain circumstances not then present in this case – of the Preferred Stockholder to increase the size of PPHI's Board of Directors and appoint new Directors so that the Preferred Stockholder's designees form a majority of the Board.

Pursuant to Blum's reading of the Certificate of Designations, the Preferred Stockholder had the authority to exercise that stacking privilege on August 8, 2010. Regardless of whether its interpretation of the Certificate of Designations is correct, the Preferred Stockholder planned to take control of PPHI's board on the strength of that interpretation. In a letter dated June 22, 2010, Blum informed PPHI that not only did the Preferred Stockholder intend to stack the board but that it will also implement "immediate liquidation of the assets of Pitcairn Properties" once they do.

If the Preferred Stockholder were permitted to exercise the Board Stacking Right, the effect on PPHI's portfolio would be disastrous. PPHI is party to various critical partnership agreements, operating agreements, and loan agreements in connection with the Joint Ventures. Many of these agreements contain change of control provisions that require prior notice and/or approval by the other contracting party should there be a change of control at PPHI. PPHI is also party to several debt agreements whereby a change of control, absent notice and/or prior approval by the lender, would be considered by the lender to be an event of default. It is unlikely that lenders will waive their change of control rights. In the current market, lenders are looking for ways to call loans and bolster their balance sheet tier one capital ratios. A change of control would give the lenders an opportunity to call or renegotiate terms on otherwise conforming loans.

PPHI also has various operating agreements and partnership agreements relating to the Joint Ventures in its real estate portfolio whereby a change of control, absent prior approval by the other partner/member, would be considered an event of default. If the change of control provisions in these agreements were to be triggered, given the current real estate market, the various contracting partners are likely to take actions which could destroy the viability of PPHI's operations by leaving PPHI with non-performing assets and eliminating a substantial portion of its fee income. These provisions will also allow some of PPHI's partners to exercise buy/sell provisions in the agreements and acquire PPHI's interest in the properties at current, artificially depressed values.

In short, PPHI's partnership, management, and loan agreements with key business partners link PPHI's rights and obligations to structural stability. That structural stability is solid so long as PPHI is not forced to seek alternative financing or liquidation of assets in the current environment of frozen debt markets. A change of control would force the company to seek alternative financing, a near-impossible task in the current market.

If the Preferred Stockholder were to stack the board, friction, dislocation, and diminution in PPHI's value would likely follow. The combination of a disruption of key business partners

and lenders and the loss of fee income and asset sales at distressed prices that would follow if the Preferred Stockholder were to stack the board would erode and most likely destroy PPHI's operating platform.

Blum and the Preferred Stockholder are aware of the devastating effect that their stacking the board would have on PPHI's portfolio, but have illustrated time and time again, through Blum who is authorized to make all decisions with respect to the Preferred Stock, that they have little regard for the interests of PPHI as a whole or for its common stockholders. To the contrary, Blum has illustrated by his words and by his actions that if PPHI were to succeed in taking control of the company Pitcairn Properties' assets would be liquidated by selling them at fire sale prices, thus destroying common stockholder value.

The threatened result is not surprising given the pattern of self-dealing and conflict of interest shown by Blum during his tenure on PPHI's board. Notwithstanding his fiduciary duty of loyalty to PPHI, Blum has repeatedly attempted to purchase all or part of PPHI on terms that would benefit himself, the Preferred Stockholder, or other entities he controls at the expense of the common stockholders of PPHI. He has done this through improperly manipulating his estimates of the value of PPHI and through blatant self-dealing, all with the goal of taking control of PPHI and getting his hands on its valuable real estate portfolio.

In order to avoid the disastrous consequences that would result from the Preferred Stockholder's exercise of the Board Stacking Rights, PPHI and PPI filed an action in the Delaware Court of Chancery against Blum, the Preferred Stockholder and other related entities on July 20, 2010 (the "Chancery Court Action"). In this action, PPHI sought, among other things, a temporary restraining order and a preliminary injunction barring the Preferred Stockholder from exercising the Board Stacking Right. After a preliminary hearing on July 23, 2010, the Vice Chancellor entered an order scheduling a hearing on the request for a preliminary injunction on September 3, 2010, and barring the Preferred Stockholder from the Board Stacking Right until that request is decided.

Notwithstanding the hearing scheduled for September 3, 2010, in the exercise of their fiduciary duties, the Board of Directors of PPHI determined that the Debtor could not face the risk that the Vice Chancellor might deny the requested preliminary injunction and allow the Preferred Stockholder to exercise the Board Stacking Right immediately. Even though the Board was confident of PPHI's position that the Preferred Stockholder did not have the power to exercise that right, the catastrophic consequences that would come about if the Vice Chancellor disagreed with the PPHI's position were too great. Accordingly, the Board determined that PPHI should file a voluntary petition under the Bankruptcy Code in order to protect the company and its assets for the benefit of its creditors and equity interest holders.

### B. The Chapter 11 Proceeding is Filed

PPHI commenced this bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code on September 1, 2010. PPHI took a number of immediate steps in connection with the initial filing that were designed to reduce the impact of the bankruptcy on its operations. On the Petition Date, substantial efforts were made to contact and explain the filing to PPHI's creditors and equity interest holders. In addition, the Debtor filed a routine motion to

be allowed to continue to use its cash management system, which facilitated a smoothe transition into bankruptcy.

In addition, on the Petition Date, the Debtor filed a notice [Docket No. 5] removing the Chancery Court Action to the Bankruptcy Court. The Debtor intends to pursue its claims against the holder of the Preferred Stock, Blum and others in the Bankruptcy Court. However, because the automatic stay under section 362 of the Bankruptcy Code bars the holder of the Preferred Stock from exercising the Board Stacking Right, the Debtor has not needed to pursue its claim for a preliminary injunction further.

Subsequent to the Petition Date, PPHI has taken a number of formal steps in the Bankruptcy Court to smooth its transition into bankruptcy. Pursuant to motions and applications filed with the Bankruptcy Court, PPHI has employed Hangley Aronchick Segal & Pudlin, P.C. and Young Conaway Stargatt & Taylor, LLP as its general and local bankruptcy counsel. In addition, the Debtor has retained CBRE Capital Markets, Inc. as its financial advisor. Also, as discussed above, the Debotr has asked the Bankruptcy Court to set a final date for the filing of proofs of claims or interests in the Debtor.

These efforts have paid off in measurable ways. Passage into Chapter 11 has had only a modest effect on operations, and PPHI has continued its efforts to maintain and increase the vitality of its business.

## C.    Overall Financial Obligations

A breakdown of PPHI's capital structure as of the Petition Date, and based upon PPHI's information and belief as of the Petition Date, is set forth on the following chart:

| PPHI Estimated Claims and Interests | |
| --- | --- |
| Priority Claims | $0 |
| Wells Fargo Claim | $10,300,000 |
| McGuire Claims | $414,000 |
| Other Unsecured Claims | $45,000 |
| Guarantee Claims | Unliquidated |
| Accrued Preferred Stock Dividends | $7,600,000 |
| Preferred Stock Interests | $50,000,000 |
| Restricted Stock Units | N/A |
| Common Stock Interests | N/A |

## IV.    OVERVIEW OF THE PLAN

### A.    Purposes of the Plan

The Debtor has proposed the Plan with the principal objective of settling the claims of unsecured Creditors, resolving PPHI's dispute with its existing Preferred Stockholders, pursuing Causes of Action, and making Distributions to Creditors.

### B.    The Chapter 11 Process

It is not possible to describe herein all the nuances of Chapter 11 practice as it relates to negotiation and preparation of the Plan.  For a more detailed description, the Bankruptcy Code should be consulted.   You are urged to read the contents of this Disclosure Statement and the Plan carefully in making your decision to accept or reject the Plan.  Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they existed before the institution of this Chapter 11 case.

### C.    Classification

The first step in preparing a plan of reorganization is the classification of Claims and Interests.  This means analyzing all liabilities of a debtor and dividing them into categories based upon the legal character and priority of the claims.  Once the categories have been created, a debtor proposes a method of treatment for each category.  The basic rules are as follows:

*Administrative Expenses*.  Administrative Expenses, as set forth in Section 503 of the Bankruptcy Code, must be paid in full on the effective date of a plan unless otherwise agreed.

*Priority Claims*.  Priority Claims, as set forth in Section 507(a) of the Bankruptcy Code (e.g., wage claims, consumer deposits, state and federal taxes), must be paid in full before any payments to unsecured creditors can be made.

*Secured Creditors*.  All plans must pay secured creditors the lesser of the value of the collateral or the amount of the debt, or, alternatively, provide for deferred payments to the secured creditor that have a present value equal to the lesser of the value of the collateral or the amount of the debt.  The Bankruptcy Code distinguishes between "oversecured" and "undersecured" creditors.  Oversecured creditors are entitled to receive interest on their claims.  Undersecured creditors holding recourse claims are entitled to a Secured Claim to the extent of the value of the assets securing the claim as of the commencement of the bankruptcy case and an Unsecured Claim for any deficiency between the amount owed and the value of the assets securing the claim.

*Unsecured Claims*.  Unsecured Claims generally do not accrue interest.  Technically, these claims may be eliminated if there is no value remaining for them after Secured, Administrative and Priority claimants are paid.  In this case, the Debtor anticipates that it will be able to pay its trade creditors and other general unsecured creditors the full amount of their claims over an extended period of time.

*Interests*:  In many bankruptcy cases, equity interests receive little or no distribution on account of their claims.  Where creditors are paid in full, however, equity interest holders are entitled to receive distributions under the Plan.  The Debtor proposes to pay creditors in full under the Plan, and thus plans to distribute property to equity holders, as described in greater detail below.

Once the Administrative Expenses, Claims and Interests have been classified and the treatment determined, a plan and disclosure statement are prepared and filed.  As previously discussed, a disclosure statement (this document) describes a plan and the means by which it will be effectuated.

After a plan and disclosure statement are filed, the Bankruptcy Court holds a hearing to determine whether the disclosure statement contains "adequate information."  If the Bankruptcy Court so determines, the proponent of the plan mails the plan, the disclosure statement and a ballot to all creditors entitled to vote.  At the conclusion of voting, the Bankruptcy Court holds a confirmation hearing at which time, if applicable, the Bankruptcy Court determines whether the plan meets the statutory requirements of the Bankruptcy Code.

Once the Bankruptcy Court has confirmed a plan and the confirmation order is not subject to any stay, there is a closing and such plan goes into effect.  That date is generally called the "Effective Date."  On that date, the payments to be made under the plan begin, and the debtor is discharged from all liabilities except the obligation to make plan payments.

### D.    General Outline Of The Plan

The Plan is premised on the fact that the going concern value of PPHI exceeds its liquidation value and that, by eliminating the existing indebtedness and realigning its equity structure so that PPHI can continue in operation and obtain further financing, it is possible to give PPHI's creditors and equity interest holders more value than they would receive in a liquidation.

The Plan contemplates the payment in full of bankruptcy costs and non-tax priority claims.  Priority tax claims will be paid in accordance with the provisions of the Bankruptcy Code.  Other creditors and the holder of the Preferred Stock will be paid in full, with interest, over various specified time periods.  The following chart summarizes the proposed classification and treatment of the claims and interests under the Plan:

| Summary of Plan | | | |
|---|---|---|---|
| **Class** | **Description** | **Estimated Allowed Amount** | **Proposed Treatment** |
|  | Administrative Expenses | $0 | Paid in full as soon as practicable on or after the Effective Date, unless otherwise agreed |
|  | Administrative Expenses of Professionals | Unknown | Paid in full upon Bankruptcy Court approval |

| Summary of Plan | | | |
|---|---|---|---|
| Class | Description | Estimated Allowed Amount | Proposed Treatment |
| | Priority Tax Claims | $0 | Paid in full over five years from Petition Date |
| 1 | Priority Claims | $0 | Paid in full as soon as practicable on or after the Effective Date, unless otherwise agreed |
| 2 | Wells Fargo Secured Claim | $0 | Paid in full on or before the later of June 30, 2011 or the contractual due date thereof without acceleration, plus interest at the rate of five percent (5%) per annum |
| 3 | General Unsecured Claims | $10,8000,000 | Paid in full on or before the later of June 30, 2011 or the contractual due date thereof without acceleration, plus interest at the rate of five percent (5%) per annum |
| 4 | Accrued Preferred Stock Dividends | $7,600,000 | Paid in full, with interest at the rate of six percent (6%) per annum, on or before the second anniversary of the Effective Date |
| 5 | Contingent Claims | $0 | Retain existing legal, equitable, and contractual rights |
| 6 | Preferred Stock Interests | $50,000,000 | Paid full redemption price of such Interest (less any amount classified as a Class 4 Claim) plus interest at the rate of 6% per annum, within five years of Effective Date, as described in detail below |
| 7 | Other Equity Interests[4] | N/A | Retain interests as they existed prior to Petition Date |

As to distributions to holders of Interests in Class 6, after payment in full of the Class 3 Claims and Class 4 Claims, upon the sale of any Real Estate Interests, 50% of the Net Real Estate Proceeds shall be paid holders of Class 6 Interests in proportion to their respective interests at or promptly after the closing. In addition to, and notwithstanding any sales of Real Estate Interests, the following minimum payments shall be made to holders of Class 6 Interests:

---

[4] The class of Other Equity Interests includes both PPHI's Common Stock and the Restricted Stock Units.

| Date | Cumulative Payments |
|---|---|
| On or before the second anniversary of the Effective Date | At least $10 Million (or the outstanding balance, whichever is less) |
| On or before the third anniversary of the Effective Date | At least $25 Million (or the outstanding balance, whichever is less) |
| On or before the fourth anniversary of the effective Date | At least $40 Million (or the outstanding balance, whichever is less) |
| On or before the fifth anniversary of the Effective Date | The remaining outstanding balance |

### E.     Funding of the Plan and Reorganized PPHI

The Plan will be funded through the Assets of the Debtor and Reorganized PPHI, the pursuit of Causes of Action, if any, and cash infusions obtained from new investors.  The level of funding needed for the short-term payments called for under the Plan is low, since most classes will receive payment over significant period of time or Common Stock rather than cash. Payments due under the Plan in the short term will be made from projected cash flow or liquidation of existing Assets.

In the longer term, as described above, PPHI intends to obtain long term financing, totaling at least $50 million and up to as much as $150 million.

### F.     Plan Confirmation

The Court is required to make several findings prior to confirming any plan.  In particular, the Court must find, *inter alia*, that:

(i)      Confirmation of a plan is not likely to be followed by the need for further financial reorganization of PPHI, unless contemplated in the plan.  In short, the Court must find that the Plan adequately addresses PPHI's needs and that it is likely that parties required to perform or pay monies under the Plan will be able to do so.

(ii)     The plan is in the "best interests" of all creditors and interest holders of PPHI.  To satisfy this requirement, the Court must determine that each Class of holders of Claims against and Interests in PPHI has accepted the Plan, or will receive or retain Assets under the Plan which, as of the Effective Date, have a value not less than the amount such claimant would receive if PPHI were liquidated under Chapter 7 of the Bankruptcy Code.

(iii)    Even though a class of Claims or Interests may have rejected a plan, the Plan is fair and equitable within the meaning of Section 1129(b)(2) of the Bankruptcy Code and does not discriminate unfairly against such non-accepting Class.  PPHI

intends to invoke the "cram down" provisions of Section 1129(b) of the Code to obtain confirmation of the Plan over the rejection of the Plan by any impaired Class that votes to reject the Plan; accordingly, if any Class votes to reject the Plan, the Court will need to make a finding as to the fairness and non-discriminatory effect of the Plan.

(iv)    The Plan was proposed in good faith.

## V.    EXECUTORY CONTRACTS

PPHI will assume any executory contracts under the Plan and, in conjunction with doing so, cure any defaults under such contracts to the extent required to do so under the Bankruptcy Code.

## VI.    POST-REORGANIZATION MANAGEMENT

Subsequent to Confirmation and the Effective Date, the current officers of PPHI will continue to run the company. PPHI's current officers have been involved with the company for many years and are critical to the continuation, expansion and profitability of its business. After the Effective Date, the initial Board of Directors of Reorganized PPHI shall be the same as the membership of the Board of Directors of the Debtor prior to the Effective Date.

Under the Plan, the Preferred Stockholder will not retain any rights it had under the Certificate of Designations regarding the management and governance of the Debtor. The Preferred Stockholder will not have the right to designate a member of the Debtor's Board of Directors, nor will it have the right to vote on the membership of the Board of Directors.

## VII.    ALTERNATIVES TO REORGANIZATION

If the Plan is not confirmed and consummated, the alternatives include: (a) preparation and presentation of an alternative Chapter 11 plan; (b) sale of PPHI's assets as a going concern; (c) a Chapter 11 liquidation; or (d) conversion of PPHI's Reorganization Case into a liquidation under Chapter 7 of the Bankruptcy Code. PPHI submits that the current Plan provides the best return for PPHI's creditors and stockholders and is preferable to each of these other alternatives.

### A.    **Alternative Chapter 11 Plan.**

If the Plan is not confirmed, the Debtor, or any other party in interest, could attempt to formulate an alternative Chapter 11 plan or plans, which might involve either a reorganization and continuation of PPHI's business, or an orderly liquidation of its estate. In formulating and developing the current Plan, PPHI and certain of its Creditors and stockholders have explored numerous other alternatives. The consideration of these plan alternatives resulted in the formulation of the current Plan. PPHI believes that the current Plan deals fairly with the rights of holders of the various classes of Claims and Interests and enables Creditors and shareholders to realize the greatest recovery possible under these circumstances. PPHI further believes that rejection of the current Plan in favor of some alternative method of restructuring the Claims and Interests of the various classes will not result in a better recovery for any class and will require, at the very minimum, an extensive and time-consuming negotiation process.

### B.     Sale of the Debtor.

PPHI does not believe that the solicitation of bids from third parties to purchase PPHI's assets and/or business would result in a proposal that would provide for greater distributions to Creditors and shareholders than are called for under the Plan.  As discussed above, much of PPHI's value rests in its human capital and the synergies it achieves from its overall property and management portfolio.  Any purchase of PPHI's assets would be successful only to the extent it could retain this human capital and these synergies.  Given this contingency, PPHI believes that the potential value to the estate of pursuing a sale of the Debtor's assets is minimal.

Moreover, exploration of sale possibilities creates considerable risks to PPHI, particularly given the low likelihood of such a sale being a superior option for Creditors and shareholders than this Plan.  In addition to the substantial additional costs and delays that would result from the negotiation of such a sale, regardless of whether it ultimately came to fruition, PPHI is concerned about the effect of sale discussions on its competitive position.  Inevitably, any bidders on PPHI's assets would likely be competitors in its business.  In considering bids from such competitors, PPHI could be at risk for divulging confidential information to its competitors that might materially impair its ability to compete effectively subsequent to Confirmation of the Plan.  This risk exists whether or not a third-party bid ultimately results in a sale of PPHI's business and assets.

Finally, pursuit of a sale of all of PPHI's real estate assets in the present market is unlikely to be beneficial to PPHI and its estate, creditors and stockholders.  The current real estate market is depressed, and sales in the short term are unlikely to generate the highest and best value for the properties in PPHI's portfolio.

### C.     Chapter 11 Liquidation

Another alternative to confirmation and consummation of the Plan is liquidation of PPHI under Chapter 11 of the Bankruptcy Code.  Under this scenario, PPHI (or, if a Court orders the appointment of a trustee, the trustee) would liquidate the assets in its Estate.  PPHI does not believe that the holders of Claims and Interests would receive greater recoveries if PPHI were liquidated under Chapter 11, particularly given that much of the value of the Debtor resides in its human capital and the synergies it achieves from its overall property and management portfolio.  It is unlikely that the Debtor could recapture these values in a liquidation.  PPHI submits that a Chapter 11 liquidation of its assets would not yield a materially greater recovery to Creditors and stockholders than the values set forth in the Liquidation Analysis set forth below.

### D.     Chapter 7 Liquidation

A fourth alternative to confirmation and consummation of the Plan is liquidation of PPHI's assets under Chapter 7 of the Bankruptcy Code.  Section 1129(a) of the Bankruptcy Code further provides that the Bankruptcy Court may only confirm a plan if each non-accepting holder of an Allowed Claim or Interest in an impaired class receives and retains under the Plan on account of such claim property having a value as of the Effective Date of the Plan at least equal to the value that such holder would receive if PPHI were to be liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.  As set forth in the following paragraph, PPHI does not

believe that holders of Claims against and Interests in PPHI would receive greater recoveries if PPHI were to be liquidated under Chapter 7 of the Bankruptcy Code.

## E. Liquidation Analysis

As noted above, another alternative to confirmation and consummation of the Plan is liquidation of the Debtor under either Chapter 7 or Chapter 11 of the Bankruptcy Code. Moreover, before it may confirm the Plan, the Court must determine (with certain exceptions) that the Plan provides to each member of each impaired Class that does not accept the plan a recovery that has a value that is at least equal to the distribution which such member would receive if PPHI were liquidated under Chapter 7 of the Bankruptcy Code. Such determination is referred to as the "best interest of creditors" test.

In a Chapter 7 case, the Court would apportion all the funds first to satisfy: the Claims of secured creditors, to the extent property of the estate constituted collateral for such claims; the costs of the liquidation (including trustee's commissions and the fees of professionals employed by the trustee); the expenses incurred by the Chapter 7 trustee; the unpaid expenses (including professional fees) incurred by PPHI while the case was administered under Chapter 11; and other bankruptcy priority obligations. The Court must next determine the amount of non-subordinated unsecured claims allowed in the liquidation proceedings. The value of the distribution (after subtracting the amounts described above) would be compared with the value offered to impaired classes of Claims and Interests under the Plan to determine if the Plan is in the best interest of such classes.

PPHI believes that the Plan provides for Distributions to Creditors and holders of Interests in all Classes that are at least as much as would be distributed in the event the Case were converted to Chapter 7 of the Bankruptcy Code and the assets of the Estate liquidated by a trustee. The Plan provides for payment in full of all Creditors and the Preferred Stockholder. These parties in interest could not receive anything more in a liquidation. In addition, PPHI believes that the sale of its Real Estate Interests in a liquidation, particularly given the current state of the economy and the real estate market in particular, would severely depress the proceeds of the liquidation of these interests. This would result in a significant decrease in, if not elimination of, any value remaining for common stockholders. It could even result in a reduction in the amount available to other parties in interest who will be paid in full under the Plan. Therefore, PPHI believes that the Plan provides creditors and stockholders with more than they would receive if the Case were converted and the Assets liquidated by a trustee in Chapter 7 of the Bankruptcy Code.

## VIII. RISK FACTORS

Creditors and holders of Interests in PPHI should consider the following risk factors inherent to the Plan.

## A. Non-Confirmation

Even if all Classes of Claims and Interests vote to accept the Plan, the Plan might not be confirmed by the Bankruptcy Court or the conditions to the Effective Date of the Plan may not be satisfied. The Debtor believes all requirements necessary for confirmation of the Plan have

been or will be met; there can be no assurance, however, that the Bankruptcy Court will reach the same conclusion.

### B.     <u>Non-Consummation</u>

Even if the Bankruptcy Court confirms the Plan, Reorganized PPHI's ability to make Distributions and sustain and create additional value for shareholders is dependent on Reorganized PPHI's ability to generate funds from operations and the liquidation of real estate interests. In the short term, Reorganized PPHI may have to sell some of its real estate assets in order to fund Distributions under the Plan. As noted above, the current real estate market is somewhat depressed, which may inhibit Reorganized PPHI's ability to generate sufficient funds from asset sales, or to effectuate such sales in sufficient time to make the payments on the schedule set forth in the Plan.

### C.     <u>Business Risk</u>

No assurance can be made that the future operational revenues of Reorganized PPHI will prove sufficient to generate value for holders of Common Stock. While PPHI believes that it will be able to achieve the projections set forth above and obtain sufficient operational revenues to create value for its stockholders in the future, there is no certainty that Reorganized PPHI will achieve its projected income levels. Numerous factors will bear on Reorganized PPHI's ability to achieve these goals, including, without limitation, market conditions, PPHI's ability to move out of the bankruptcy, and PPHI's ability to obtain new capital financing as needed. Although PPHI believes that it has taken these factors into account in developing the projections set forth above, it cannot guarantee that its assumptions will prove entirely accurate.

### D.     <u>Other Risks</u>

The value of Distributions to Creditors and of Common Stock is subject to certain additional risks. Reorganized PPHI will only be able to make Distributions to Creditors and create value for its shareholders to the extent its operational earnings exceed the amounts needed to make the other payments required under the Plan and during the course of future operations. Moreover, the Common Stock of Reorganized PPHI may be subject to limits on transferability. Similarly, each person who holds Common Stock under the Plan will be a minority shareholder of Reorganized PPHI. Finally, the form and terms of future investments by strategic partners or venture capitalists may affect the value of the Common Stock.

## IX.     LIMITATIONS ON LIABILITY

The Debtor and its officers, directors, managers, employees, members, agents, advisors, accountants, attorneys and representatives, in each case solely in their capacity as such (each, an "Exculpated Party") shall neither have nor incur any liability to any Person or Entity for any action taken or omitted to be taken after the Petition Date in connection with or related to the Chapter 11 Case, including, without limitation, the preparation and filing of the Chapter 11 Case, or the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan; provided, however, that the exculpation provided for in Section 14.1 of the Plan shall not affect or modify any obligations

created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan and shall not release any action or inaction constituting willful misconduct or gross negligence, in each case subject to the determination of such by final order of a court of competent jurisdiction; provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities, if any, under the Plan and such reasonable reliance shall form an absolute defense to any such claim, Cause of Action or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the benefits and protections of section 1125(e) of the Bankruptcy Code.

Likewise, neither the Debtor nor any Committee, nor any of their employees, officers, directors, members, agents, or representatives, nor any Professionals employed by any of them, shall have or incur any liability to any person or entity for any act taken or omission made in good faith in connection with or related to formulating, implementing, confirming, or consummating this Plan and the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with this Plan.

Except as provided in the Plan or the Confirmation Order, all entities who have held, hold or may hold Claims against or Interests in any of the Debtor or the Reorganized Debtor are permanently enjoined, on and after the Effective Date, from: (a) Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest; (b) The enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Reorganized Debtor; and (c) Creating, perfecting or enforcing any encumbrance of any kind against the Debtor or against the property or interests on property of the Reorganized Debtor on account of any such Claim.

## X.    MISCELLANEOUS PROVISIONS

### A.    <u>Plan Modifications and Retention of Jurisdiction</u>

**PPHI MAY WITHDRAW OR MODIFY THE PLAN AT ANY TIME PRIOR TO THE CONFIRMATION DATE, AND AFTER THE CONFIRMATION DATE,** PPHI **MAY MODIFY THE PLAN WITH THE APPROVAL OF THE BANKRUPTCY COURT AFTER NOTICE AND HEARING.**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Reorganization Case after the Effective Date to the full extent legally permissible.  The Debtor believes the Court will have continuing jurisdiction over the following matters, among others:

1.    to consider any modification of the Plan under Section 1127 of the Bankruptcy Code or modification of the Plan after substantial consummation as defined in Section 1101(2) of the Bankruptcy Code;

2.    to determine if "substantial consummation" as defined in Section 1101(2) of the Bankruptcy Code has occurred;

3.     to hear and determine all Causes of Action and all controversies, suits and disputes that may arise in connection with the interpretation or enforcement of this Plan;

4.     to hear and determine all requests or disputes with respect to compensation and reimbursement of expenses which may be made before or after the Confirmation Date;

5.     to hear and determine all objections, defenses and counter-claims to Claims, controversies, suits, disputes and Avoidance Actions that may be pending at or initiated after the Confirmation Date;

6.     to consider and act on the compromise and settlement of any Claim against or Avoidance Action on behalf of the Debtor's estate;

7.     to direct the Debtor, or any other necessary parties, to perform any act that is necessary for the consummation of the Plan;

8.     to enforce the injunctions contained in the Confirmation Order;

9.     to set aside liens and encumbrances, and to adjudicate any Avoidance Action, including preferences, transfers, assets or damages, to which the Debtor or any other party may be entitled under applicable provisions of the Bankruptcy Code or other federal, state or local law;

10.    to adjudicate all controversies concerning the classification, liquidation or allowance of any Claims or Requests;

11.    to hear and determine all controversies relating to any Lease Agreement, Asset Purchase Agreement or Sale;

12.    to hear and determine all controversies relating to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease, including, without limitation, any motion filed pursuant to Section 6.1 hereof;

13.    to continue to seek to recover all Assets and properties of the Debtor wherever located;

14.    to consider and act on such other matters as are consistent with the Plan;

15.    to consider any motions or requests to abandon property of the Debtor's estate; and

16.    to enter a final decree closing this Case.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or otherwise is without jurisdiction over any matter arising out of this proceeding, including any

Causes of Action, the Plan shall have no effect upon and shall not preclude the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## B. Causes of Action

Unless a claim or Cause of Action against a Person or Entity is expressly waived, abandoned, relinquished, released, compromised, settled or treated otherwise in the Plan or any Final Order, including, without limitation, the Confirmation Order, the Debtor expressly reserves such claim or Debtor Cause of Action, whether existing as of the Petition Date or thereafter arising, including, but not limited to, any adversary proceeding filed in the Chapter 11 Case and any and all claims and Causes of Action not specifically identified or of which the Debtor may presently be unaware of which arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist, for later action by the Reorganized Debtor, as applicable, and therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after Confirmation based on the Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been expressly waived and released in the Plan.

The Reorganized Debtor may pursue, settle, or withdraw any Causes of Action, including without limitation the adversary proceeding against the holder of the Class 6 Interests and related persons, pending in this Court and docketed as Adversary #_____. The Bankruptcy Court will retain jurisdiction over such Causes of Action commenced prior to the closing of this Case, after the Case is closed and until the final resolution thereof.

## C. The Effective Date and Conditions Precedent to Consummation

The occurrence of the Effective Date and the consummation of the Plan set forth herein are subject to the following conditions precedent that: (a) the Confirmation Order, in form and substance acceptable to the Debtor, shall have been signed by the Bankruptcy Court, and there shall not be a stay or injunction in effect with respect thereto; and (2) the Debtor shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are determined by the Debtor to be necessary to implement the Plan.

The Effective Date shall be a date selected by the Debtor that is within thirty (30) days after the first business day on which all conditions precedent to the Effective Date specified in Section 9.1 hereof have been satisfied or waived. Within ten (10) days after the occurrence of the Effective Date, the Debtor shall send notice, via first-class mail, of the occurrence of the Effective Date to all holders of Administrative Expenses, Claims and Interests, and all other parties in interest in the Case.

If the consummation of the Plan does not occur, whether by failure to satisfy any of the conditions precedent, the withdrawal of the Plan, or otherwise, the Plan and the Confirmation Order will be deemed null and void, and, in such event, any consents or releases given in anticipation of the implementation of the Plan shall be void *ab initio* and nothing contained

herein shall affect the rights or remedies of the Debtor, any Committee or any Creditor or Security Interest Holder.

### D. Federal Income Tax Consequences of the Plan

THERE MAY BE TAX CONSEQUENCES OF THE PLAN TO CREDITORS AND INTEREST HOLDERS.  A CREDITOR THAT RECEIVES CASH SATISFACTION OF ITS ALLOWED CLAIM WILL GENERALLY RECEIVE GAIN OR LOSS WITH RESPECT TO THE PRINCIPAL AMOUNT OF THE ALLOWED CLAIM.  NO RULINGS HAVE BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE AND NO LEGAL OPINIONS HAVE BEEN REQUESTED FROM COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THIS PLAN.

FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS AND EQUITY INTEREST HOLDERS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST IS APPROPRIATE.  HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES PECULIAR TO THEM UNDER THE PLAN.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## XI. CONCLUSION

The Debtor believes that the Plan offers an opportunity to restore PPHI to stability. Under the Plan, PPHI will be able to achieve a sound financial footing while providing significant benefits to its Creditors and stockholders.  While there can be no guarantee of success, with the ingredients provided by the Plan, along with careful and prudent management, PPHI can stabilize, obtain additional funding, and expand and operate successfully.  PPHI submits that the Plan provides the best hope for the success of its business and the greatest chance for a significant return to Creditors.

PPHI respectfully requests that you cast your vote in favor of the Plan.

Dated: September 2, 2010         **PITCAIRN PROPERTIES HOLDINGS, INC.**

By:    <u>/s/ Salah A. Mekkawy</u>
        Salah A. Makkawy
        Chief Executive Officer

## EXHIBIT A

## PLAN OF REORGANIZATION OF
## PITCAIRN PROPERTIES HOLDINGS, INC.

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **PITCAIRN PROPERTIES HOLDINGS, INC.**[1] | **Case No. 10-12764 (PJW)** |
| Debtor. | |

## DEBTOR'S PLAN OF REORGANIZATION

### (September 2, 2010)

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
Robert F. Poppiti, Jr. (No. 5052)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

HANGLEY ARONCHICK SEGAL & PUDLIN
James M. Matour (pro hac vice admission pending)
Matthew A. Hamermesh (pro hac vice admission pending)
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200 (phone)
(215) 568-0300 (fax)

PROPOSED ATTORNEYS FOR DEBTOR
AND DEBTOR-IN-POSSESSION

---

[1] The last four digits of the Debtor's federal tax identification number are 3452. The Debtor's address is One Pitcairn Place, 165 Township Line Road, Suite 1500, Jenkintown, PA 19046-3599.

**TABLE OF CONTENTS**

**ARTICLE 1. DEFINITIONS** ................................................................................................ 1
  1.1   "Administrative Expense" ..................................................................................... 1
  1.2   "Allowed" .............................................................................................................. 1
  1.3   "Assets" ................................................................................................................. 2
  1.4   "Avoidance Actions" ............................................................................................ 2
  1.5   "Bankruptcy Code" .............................................................................................. 2
  1.6   "Bankruptcy Court" ............................................................................................. 2
  1.7   "Bankruptcy Rules" ............................................................................................. 2
  1.8   "Bar Date" ............................................................................................................ 2
  1.9   "Case" ................................................................................................................... 2
  1.10  "Cash" ................................................................................................................... 2
  1.11  "Causes of Action" .............................................................................................. 2
  1.12  "Chapter 11" ......................................................................................................... 2
  1.13  "Claim" ................................................................................................................. 2
  1.14  "Class" .................................................................................................................. 3
  1.15  "Code" .................................................................................................................. 3
  1.16  "Committee" ......................................................................................................... 3
  1.17  "Confirmation Date" ........................................................................................... 3
  1.18  "Confirmation Order" .......................................................................................... 3
  1.19  "Creditor" ............................................................................................................. 3
  1.20  "Debtor" ............................................................................................................... 3
  1.21  "Debtor-in-Possession" ....................................................................................... 3
  1.22  "Disallowed" ........................................................................................................ 3
  1.23  "Disclosure Statement" ....................................................................................... 3
  1.24  "Disputed" ............................................................................................................ 3
  1.25  "Distribution" ...................................................................................................... 3
  1.26  "Effective Date" ................................................................................................... 3
  1.27  "Encumbrance" ..................................................................................................... 4
  1.28  "Estate" ................................................................................................................. 4
  1.29  "Final Order" ....................................................................................................... 4
  1.30  "Interest" .............................................................................................................. 4
  1.31  "Net Real Estate Interest Proceeds" ................................................................... 4
  1.32  "Petition Date" ..................................................................................................... 4
  1.33  "Plan" ................................................................................................................... 4
  1.34  "Preferred Stock" ................................................................................................. 4
  1.35  "Priority Claim" ................................................................................................... 4
  1.36  "Priority Tax Claim" ............................................................................................ 4
  1.37  "Professional" ...................................................................................................... 4
  1.38  "Proponents" ........................................................................................................ 4
  1.39  "Purchaser" .......................................................................................................... 5
  1.40  "Real Estate Interest" .......................................................................................... 5
  1.41  "Reorganized Debtor" ......................................................................................... 5
  1.42  "Request" .............................................................................................................. 5

1.43 "Schedules" ........................................................................................ 5
1.44 "Secured" ........................................................................................... 5
1.45 "Tax Code" ......................................................................................... 5
1.46 "Unsecured Claim" ............................................................................. 5
1.47 "Wells Fargo" ..................................................................................... 5

**ARTICLE 2. PROVISIONS FOR TREATMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ............................................................ 6**
2.1 Administrative Expenses ..................................................................... 6
2.2 Deadline for Administrative Expenses ................................................ 6

**ARTICLE 3. CLASSIFICATION OF CLAIMS AND INTERESTS ..................................... 8**
3.1 Class 1 (Priority Claims) ..................................................................... 8
3.2 Class 2 (Wells Fargo Secured Claim). ................................................ 8
3.3 Class 3 (General Unsecured Claims) ................................................... 8
3.4 Class 4 (Accrued Dividend Claims). ................................................... 8
3.5 Class 5 (Contingent Claims) ............................................................... 8
3.6 Class 6 (Preferred Stock) .................................................................... 8
3.7 Class 7 (Common Stock) ..................................................................... 8

**ARTICLE 4. TREATMENT OF CLAIMS AND INTERESTS ............................................ 8**
4.1 Class 1 (Priority Claims) ..................................................................... 8
4.2 Class 2 (Wells Fargo Secured Claim) ................................................. 9
4.3 Class 3 (General Unsecured Claims). .................................................. 9
4.4 Class 4 (Dividend Claims). .................................................................. 9
4.5 Class 5 (Contingent Claims). ............................................................. 10
4.6 Class 6 (Preferred Stock). .................................................................. 10
4.7 Class 7 (Equity) ................................................................................. 11

**ARTICLE 5. IMPLEMENTATION AND EFFECT OF PLAN ........................................... 11**
5.1 Plan Implementation. ......................................................................... 11
5.2 Plan Distributions. ............................................................................. 11
5.3 Vesting of Property ............................................................................ 11
5.4 Plan Funding. ..................................................................................... 11
5.5 Plan Administration ........................................................................... 11
5.6 Disputed Administrative Expenses, Claims and Interests ................. 12
5.7 Undeliverable Distributions; Uncashed Checks ............................... 12
5.8 Statutory Fees. ................................................................................... 12
5.9 Surrender and Cancellation of Notes or Other Instruments ............. 12
5.10 The Reorganized Debtor Following the Effective Date .................... 13
5.11 Committees ........................................................................................ 13
5.12 Allocation of Plan Distributions Between Principal and Interest ..... 13
5.13 Transfer and Stamp Taxes ................................................................ 13

**ARTICLE 6. PROVISIONS FOR THE ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................................. **13**
    6.1    Assumption of Executory Contracts ............................................. 13
    6.2    Rejection Damage Claims.............................................................. 13

**ARTICLE 7. DISCHARGE** ............................................................................. **14**

**ARTICLE 8. EFFECTIVE DATE AND CONDITIONS PRECEDENT** ............... **14**
    8.1    Conditions Precedent to Effective Date......................................... 14
    8.2    Effective Date ................................................................................ 14
    8.3    Notice of Effective Date ................................................................ 15
    8.4    Failure of Condition Precedent ...................................................... 15

**ARTICLE 9. POST-CONFIRMATION CORPORATE ORGANIZATION** ......... **15**
    9.1    Management of the Debtor Post-Confirmation................................ 15
    9.2    Authorization of Corporate Action ................................................ 15
    9.3    Causes of Action ............................................................................ 15

**ARTICLE 10. OBJECTIONS TO CLAIMS** ..................................................... **16**
    10.1    Objection to Administrative Expenses, Claims or Interests ........... 16
    10.2    Bar Date for Claims and Interests .................................................. 16

**ARTICLE 11. PLAN DEFAULTS** ................................................................... **16**
    11.1    Notice of Default Under the Plan................................................... 16
    11.2    Content of Notice of Default.......................................................... 16
    11.3    Cure of Default Under the Plan ..................................................... 16

**ARTICLE 12. MODIFICATIONS TO THE PLAN** ........................................... **16**
    12.1    Modifications Prior to the Confirmation Date. ............................... 16
    12.2    Modifications Prior to the Effective Date. ..................................... 17
    12.3    Other Modifications. ...................................................................... 17

**ARTICLE 13. RETENTION OF JURISDICTION** ............................................. **17**
    13.1    Retention of Jurisdiction ................................................................ 17
    13.2    Abstention ...................................................................................... 18

**ARTICLE 14. LIMITATIONS ON LIABILITY** ............................................... **18**
    14.1    **No Liability For Solicitation or Participation** ...........**Error! Bookmark not defined.**
    14.2    **Limitation Of Liability** ................................................**Error! Bookmark not defined.**
    14.3    Injunction ...................................................................................... 18

**ARTICLE 15. MISCELLANEOUS TERMS** ..................................................... **19**
    15.1    Priority Status................................................................................ 19
    15.2    Automatic Stay.............................................................................. 19
    15.3    Preservation of Insurance.............................................................. 20
    15.4    Waiver of Fourteen (14) Day Stay ................................................ 20

15.5    Terms Binding ............................................................................................ 20

15.6    Captions .................................................................................................... 20

15.7    Plan Interpretation ...................................................................................... 20

15.8    Inconsistencies ........................................................................................... 20

15.9    Governing Law ........................................................................................... 20

15.10   Severability ............................................................................................... 20

15.11   Notice ........................................................................................................ 21

15.12   Binding Effect ............................................................................................ 21

15.13   No Admissions ........................................................................................... 22

**ARTICLE 16. CONFIRMATION REQUEST.................................................................... 22**

16.1    Confirmation Request ................................................................................. 22

# DEBTOR'S PLAN OF REORGANIZATION

The Debtor and Debtor-in-Possession in the above-captioned proceedings proposes the following Plan under Section 1121(c) of Title 11 of the United States Code:

## INTRODUCTION

Pitcairn Properties Holdings, Inc. the Debtor and Debtor-in-Possession in the above captioned case filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as hereinafter defined) on September 1, 2010. The Debtor is primarily a holding company and owns, along with interests in certain real estate owning entities, Pitcairn Properties, Inc., which, in turn, owns interests in and manages over _____ square feet of commercial real estate.

This Plan of Reorganization contemplates the payment in full of all claims against the Debtor, the payment in full of the redemption price of preferred stock in the debtor and the preservation of stock interests in Debtor.

All holders of Claims against and Interests in the Debtor are strongly encouraged to read this Plan and the accompanying Disclosure Statement in their entirety before voting to accept or reject this Plan. The provisions of this Plan shall control in the event of any inconsistency between this Plan and the Disclosure Statement.

## ARTICLE 1. DEFINITIONS

As used herein, the following terms, when capitalized, shall have the meanings set forth below.

1.1     "*Administrative Expense*" means: (a) any cost or expense of administration of this Case entitled to priority under Sections 503(b) or 507(a) of the Bankruptcy Code, including, without limitation, (i) actual and necessary post-petition expenses of preserving the Debtor's estate, (ii) actual and necessary post-petition expenses of operating the business of the Debtor, including, without limitation, post-petition loans or other advances or extensions of credit to the Debtor, including amounts advanced to or credited to the account of the Debtor pursuant to court approved Debtor-in-Possession financing, (iii) compensation or reimbursement of expenses under Section 503(b)(3)(D) or (4) of the Bankruptcy Code, or (iv) compensation or reimbursement of expenses of Professionals or Committee members, and (b) any fee or charge assessed against the Debtor's estate under Section 1930 of Title 28 of the United States Code.

1.2     "*Allowed*" means, with respect to a Claim, Administrative Expense or Interest, or portion thereof, that the Claim, Administrative Expense or Interest (a) has been allowed by a Final Order, (b) has been timely filed with the Clerk of the Bankruptcy Court on or before the Bar Date or the applicable bar date for Administrative Expenses, or has been scheduled as liquidated in amount and neither disputed nor contingent or listed on the Debtor's List of Equity

Security Holders, and as to which no objection to the allowance thereof or amendment thereto has been interposed, or (c) is specified herein as Allowed.

1.3     *"Assets"* means all property (whether tangible or intangible) of the Debtor and the Affiliated Landlords, including, without limitation, any and all inventory, equipment, accounts, accounts receivable, general intangibles, chattel paper, instruments, documents (as such terms are defined in the Uniform Commercial Code as in effect on the date hereof in Pennsylvania), real property, cash, security deposits, legal, equitable or beneficial rights in trust, escrow and custodial accounts, Causes of Action, licenses, insurance policies, proceeds of insurance policies, equity interests, and all other Cash and non-Cash proceeds of any of the foregoing.

1.4     *"Avoidance Actions"* means any causes of action of the Debtor arising under Sections 506, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code other than a cause of action released under Section 17.3 of this Plan.

1.5     "*Bankruptcy Code*" means Title 11 of the United States Code, as now in effect or hereafter amended.

1.6     *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware.

1.7     *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as amended from time to time, promulgated under Section 2075 of Title 28 of the United States Code, and the local rules of the Bankruptcy Court in effect from time to time with respect to this Chapter 11 case.

1.8     *"Bar Date"* means the last date and time fixed by order of the Bankruptcy Court to file proofs of claim on account of pre-petition obligations of the Debtor, which in this case is _____.

1.9     *"Case"* means the Chapter 11 case of the Debtor , Case No. 10-12764 (PJW), pending in the Bankruptcy Court.

1.10    *"Cash"* means cash, checks and readily marketable securities or instruments.

1.11    *"Causes of Action"* means any and all actions, causes of actions, liabilities, suits, debts, accounts, reckonings, covenants, controversies, agreements, promises, rights, variances, trespasses, damages, judgments, executions, claims (whether or not a proof of claim was filed in this Chapter 11 case with respect thereto and whether or not such claim is an Allowed Claim), whether now known or unknown, choate or inchoate, suspected or unsuspected, in law or equity or otherwise, whether arising under the Bankruptcy Code or other federal or state law.

1.12    "*Chapter 11*" means Chapter 11 of the Bankruptcy Code.

1.13    "*Claim*" has the meaning given to such term in Section 101(5) of the Bankruptcy Code.

2

1.14    *"Class"* means a category, designated herein, of holders of Claims or Interests that are substantially similar to the other Claims or Interests in such category.

1.15    *"Code"* means the United States Bankruptcy Code. *"Committee"* means the Official Committee of Unsecured Creditors appointed in this Case, if any.

1.17    *"Confirmation Date"* means the date on which the Confirmation Order is entered by the Bankruptcy Court.

1.18    *"Confirmation Order"* means an order of the Bankruptcy Court confirming the Plan.

1.19    *"Creditor"* means a holder of a Claim that arose before the Petition Date.

1.20    *"Debtor"* means Pitcairn Properties Holdings, Inc., a Delaware corporation.  As used herein, the term "Debtor" shall include the Debtor as Debtor-in-Possession as defined in the Code.

1.21    *"Debtor-in-Possession"* means the Debtor in its capacity as debtor-in-possession in the Chapter 11 Cases pursuant to Sections 1101, 1107(c) and 1108 of the Bankruptcy Code.

1.22    *"Disallowed"* means, with respect to a Claim, Administrative Expense or Interest, or portion thereof, that the Claim, Administrative Expense or Interest (a) has been scheduled by the Debtor as disputed, contingent or unliquidated and in respect of which no proof of claim or interest or Request is timely filed, (b) has not been listed on the Schedules and in respect of which no proof of claim or interest or Request is timely filed, or (c) has been disallowed by Final Order.

1.23    *"Disclosure Statement"*  means the Disclosure Statement with respect to this Plan, and all amendments, modifications, supplements and exhibits thereto filed by the Debtor with the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code on even date herewith as from time to time hereafter amended.

1.24    *"Disputed"* means, with respect to a Claim, Administrative Expense or Interest, that, with respect to such Claim, Administrative Expense or Interest, (a) a proof of claim or interest or Request has been filed or deemed filed under applicable law or order with the Bankruptcy Court; (b) an objection has been timely filed and served; and (c) such objection has not been: (i) withdrawn, (ii) overruled or denied by a Final Order, or (iii) granted by a Final Order.

1.25    *"Distribution"* means the Cash or any other Assets to be distributed to holders of Allowed Claims and Administrative Expenses pursuant to the terms hereof.

1.26    *"Effective Date"* means the date specified in Section 9.2 hereof.

1.27    *"Encumbrance"* means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property.

1.28    *"Estate"* means the Debtor's Chapter 11 bankruptcy estate

1.29    *"Final Order"* means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, that has been entered on the docket of such court and has not been reversed, stayed, modified or amended and that has not been and no longer may be appealed and as to which no appeal or rehearing or petition for certiorari is pending or as to which any right to appeal or petition for certiorari has been waived in writing in a manner satisfactory to the Debtor, or, if an appeal, rehearing or petition for certiorari has been denied, the time for any further appeal or to seek certiorari has expired.

1.30    *"Interest"* means any equity security of the Debtor, as defined in Section 101 of the Bankruptcy Code.

1.31    *"Net Real Estate Interest Proceeds"* means the net Cash proceeds received by the Debtor or any entity which is, directly or indirectly, wholly owned by the Debtor, after payment in full of all transaction costs, secured debt, amounts to which any co-owners are entitled, and after deduction for any anticipated income taxes, as estimated by the Debtor's regular tax accountant.

1.32    *"Petition Date"* means September 1, 2010, the date this Case was commenced.

1.33    *"Plan"* means this Plan of Reorganization, as amended from time to time, including, without limitation, all addenda, exhibits, schedules and other attachments hereto, all of which are incorporated herein by reference, as from time to time hereafter amended.

1.34    *"Preferred Stock"* means any Interest in the Debtor represented by the Preferred Stock of the Debtor designated as Series A Convertible Redeemable Preferred Stock pursuant to that certain Certificate of Designations of PPHI dated June 24, 2004.

1.35    *"Priority Claim"* means any Claim entitled to priority under Section 507(a) of the Bankruptcy Code, other than an Administrative Expense or a Priority Tax Claim.

1.36    *"Priority Tax Claim"* means any Claim entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

1.37    *"Professional"* means any entity retained by the Debtor and the Committee, including, but not limited to, attorneys, accountants, investment bankers, consultants and auditors.

1.38    *"Proponents"* means the Debtor together with any entity that, after being invited to do so by the Debtor, agrees to become a Plan proponent and thereafter files with the Court a written joinder in the Plan.

1.39　　*"Purchaser"* means an entity that enters into an Asset Purchase Agreement with the Debtor to effectuate a Sale.

1.40　　*"Real Estate Interest"* means any real estate or real estate-owning entity that is owned directly (or indirectly through one or more intervening entities in which the Debtor owns a controlling interest) by the Debtor.

1.41　　*"Reorganized Debtor"* means the Debtor from and after the Effective Date.

1.42　　*"Request"* means a request for payment of an Administrative Expense filed by any entity pursuant to Section 503 of the Bankruptcy Code.

1.43　　*"Schedules"* means the Schedules of Assets, Liabilities and Executory Contracts and Unexpired Leases, and Statement of Financial Affairs, filed by the Debtor with the Clerk of the Bankruptcy Court on the Petition Date pursuant to Bankruptcy Rule 1007, as such Schedules have been or may be amended from time to time.

1.44　　*"Secured"* means, with respect to a Claim, that such Claim is secured by an Encumbrance on or an interest in property of the Debtor, but only to the extent of the value of the collateral securing the interest of the holder of such Claim in such property of the Debtor as of the Petition Date.　To the extent the value of the collateral securing the Secured Claim as of the Petition Date is less than the amount of the Claim, the holder of such Claim shall have an Unsecured Claim for the difference between the value attributed to the collateral securing the Creditor's interest as of the Petition Date and the Creditor's Allowed Secured Claim if, and only if, such Secured Claim is on account of a recourse debt.

1.45　　*"Tax Code"* means Title 26 of the United States Code and any rules or regulations promulgated by the Internal Revenue Service, as amended from time to time, or any successor statute thereto.

1.46　　*"Unsecured Claim"* means, with respect to a Claim, that such Claim is: (a) (i) not secured by an Encumbrance or an interest in any property of the Debtor, (ii) secured by an Encumbrance or an interest in property of the Debtor which has no value as of the Petition Date, or (iii) if secured only in part by an Encumbrance or an interest in property of the Debtor, that portion of the Claim which represents the difference between the value of the interest of the holder of such Claim in the Debtor's interest in that property of the Debtor as of the Petition Date and such Allowed Claim if, and only if, such Secured Claim is on account of a recourse debt; (b) not a Priority Claim; and (c) not a Claim of the type described in Classes 1, 2, 3 or 4 herein.

1.47　　*"Wells Fargo"* means Wells Fargo Bank, N.A., as successor by merger to Wachovia Bank, N.A..

Whenever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter shall include the masculine, feminine and neuter.　Any term used and not defined herein, but that is defined in the Bankruptcy Code, shall have the meaning set forth therein.　The

words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole, and not to any particular section, subsection or clause of the Plan unless otherwise specified. The word "including" shall mean "including, without limitation." Unless the context requires otherwise, the Rules of Construction set forth in Section 102 of the Bankruptcy Code shall apply to construction of this Plan. In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein, the provisions of Bankruptcy Rule 9006 shall apply.

Further terms may be defined in the body of this Plan, and such definitions shall apply throughout this Plan.

## ARTICLE 2. PROVISIONS FOR TREATMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

2.1     *Administrative Expenses.*

(a)     *General*.  The Debtor shall pay to each holder of an Allowed Administrative Expense, on account thereof and in full satisfaction thereof, without interest, in Cash, the amount of such Administrative Expense as soon as practicable following the later of: (a) the Effective Date; (b) the first business date on which such Administrative Expense becomes an Allowed Administrative Expense by Final Order; or (c) the date on which payment on such Administrative Expense would have become due in the ordinary course of the Debtor's business or under the terms of the Administrative Expense in the absence of the Case.  Notwithstanding anything herein to the contrary, the holder of an Allowed Administrative Expense may be paid on such other, later date or upon such other, less favorable terms than those provided herein as may be agreed upon by the holder of such Allowed Administrative Expense and  the Debtor.

(b)     *Payment of Statutory Fees*.  On or before the Effective Date, all fees payable pursuant to 28 U.S.C. § 1930 arising on or before the Confirmation Date, as determined by the Bankruptcy Court at the hearing on Confirmation, shall be paid in cash equal to the amount of such Administrative Expense

2.2     *Deadline for Administrative Expenses*.

(a)     *General Provisions.*  Except as provided below with respect to (i) Administrative Expenses of Professionals, (ii) non-tax liabilities incurred in the ordinary course of business by the Debtor, and (iii) tax claims, Requests for payment of Administrative Expenses arising out of transactions or occurrences before the Effective Date must be filed no later than thirty (30) days after the Effective Date.  Any Holder of such an Administrative Expense who is required to file a Request for payment of such Administrative Expense and that does not file such a Request by the applicable bar date shall be forever barred from asserting such Administrative Expense against the Debtor or any of its property.

(b)     *Professionals.*  All Professionals or other entities requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including, without limitation, any compensation requested by any professional or any other entity for making a substantial contribution in the Reorganization Case) shall file and serve on the Debtor an Application for Final Allowance of Compensation and Reimbursement of Expenses no later than forty-five (45) days after the Effective Date.  Objections to Applications of Professionals for Compensation or Reimbursement of Expenses must be filed and served on the Debtor and the Professionals to whose application the objections are addressed no later than fifteen (15) days after the filing of the Application.

(c)     *Ordinary Course Liabilities.*  Holders of Administrative Expenses based on liabilities incurred in the ordinary course of the Debtor's business (other than claims of governmental units for taxes or claims and/or penalties related to such taxes) shall not be required to file any Request for payment of such Administrative Expenses.  Such Administrative Expenses shall be paid by the Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Expenses, without any further action by the holders of such Administrative Expenses.

(d)     *Post Petition Tax Expenses.*  All Requests for payment of Administrative Expenses and other claims by a governmental unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date ("Post-petition Tax Expenses") and for which no bar date has otherwise been previously established, must be filed on or before the later of (i) thirty (30) days following the Effective Date and (ii) 120 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit.  Any holder of any Post-petition Tax Expense that is required to file a Request for payment of such taxes and does not file such a Request by the applicable bar date shall be forever barred from asserting any such Post-petition Tax Expense against the Debtor or its property, whether any such Post-petition Tax Expense is deemed to arise prior to, on, or subsequent to the Effective Date.  Payment to any holder of a Post-Petition Tax Expense with respect to real estate taxes shall be paid after the resolution of any reassessment proceedings filed by the Debtor or the Affiliated Landlords under Section 505 of the Code

(e)     *Priority Tax Claims.*  The Debtor shall pay each holder of an Allowed Priority Tax Claims on account of its claim deferred cash payments over a period commencing on the Effective Date and concluding no later than the date that is five years from the Petition Date, such payments in the aggregate equaling (a) the Allowed Priority Tax Claim; and (b) interest on the Allowed Priority Tax Claim at the rate of four percent (4%) per annum until paid in full.  The Debtor may pre-pay any Priority Tax Claim at any time without penalty.  Notwithstanding anything herein to the contrary, the holder of an Allowed Priority Tax Claim may be paid on such other, less favorable terms than those provided herein as may be agreed upon by the holder of such Allowed Priority Tax Claim and the Debtor.

## ARTICLE 3. CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to Section 1122 of the Bankruptcy Code, the Debtor designates the following Classes of Claims and Interests:

3.1     *Class 1 (Priority Claims).*  Class 1 shall consist of all Allowed Priority Claims.

3.2     *Class 2 (Wells Fargo  Secured Claim).*  Class 2 shall consist of the Allowed Claim of Wells Fargo, to the extent of the value of the collateral securing such Claim.  The balance of the allowed Claim of Wells Fargo shall be a Class 3 Claim.

3.3     *Class 3 (General Unsecured Claims).*  Class 3 shall consist of all Allowed Unsecured Claims not included in Classes 4 or 5.

3.4     *Class 4 (Accrued Dividend Claims).*  Class 4 shall consist of all Allowed Claims arising from the ownership of Preferred Stock in the Debtor, on account of accrued and unpaid dividends as of the Petition Date.

3.5     *Class 5 (Contingent Claims).*  Class 5 consists of all Allowed Claims pursuant to written guarantees, surety agreements or the like, as to which payment in full of the underlying obligation was not due and payable in full by the Debtor prior to the Petition Date.

3.6     *Class 6 (Preferred Stock).*  Class 6 shall consist of all Preferred Stock, and all rights arising therefrom, including without limitation any right to payments on account of the redemption of the Preferred Stock, but excluding the Class 4 Claims.

3.7     *Class 7 (Common Stock).*  Class 7 shall consist of all Interests in the Debtor not included in Class 6.  Class 7 includes all holders of Common Stock or Restricted Stock Units of the Debtor, and does not include any Interests owned directly or indirectly by any direct or indirect owner of Preferred Stock.

## ARTICLE 4. TREATMENT OF CLAIMS AND INTERESTS

Each holder of an Allowed Claim or Interest shall receive, in full satisfaction and discharge of such Allowed Claim or Interest, the following:

4.1     *Class 1 (Priority Claims).*

(a)     <u>Impairment and Voting</u>.  Class 1 is unimpaired by the Plan.  Each holder of a Priority Claim is deemed to have accepted the Plan.

(b)     <u>Treatment and Distributions</u>.  On the Effective Date, each holder of an Allowed Class 1 Claim shall be paid the full amount of its Allowed Claim, without interest, in Cash as soon as practicable on or after the later of:  (i) the Effective Date or (ii) the first business day after the date on which such Class 1 Claim becomes an Allowed Claim by Final Order; except that Allowed Class 1 Claims representing loans or obligations incurred in the ordinary

course of business or assumed by the Debtor shall be paid in accordance with the terms of any agreement upon which such Allowed Claim is based. Notwithstanding anything herein to the contrary, the holder of any Allowed Class 1 Claim may be paid on such other date and upon such other terms as may be mutually agreed upon by the holder of such Allowed Class 1 Claim and the Reorganized Debtor.

4.2     *Class 2 (Wells Fargo Secured Claim).*

(a)     <u>Impairment and Voting</u>.  Class 2 is impaired by the Plan.  Each holder of a Class 2 Claim is entitled to vote to accept or reject the Plan.

(b)     <u>Treatment and Distributions</u>.  Wells Fargo, the holder of the Class 2 Claim, shall be paid the full amount of its Class 2 Claim, with interest at the rate of 5% per annum.  For purposes of distribution, the Class 2 Claim will be added to the amount of Wells Fargo's Class 3 Claim and paid in accordance with the provisions of Section 5.3; provided, however, that payments received by Wells Fargo shall be applied last to the principal balance of the Class 2 Claim and Wells Fargo will retain its security interest in the property securing the Class 2 Claim until such Claim is paid in full.  Notwithstanding anything herein to the contrary, the holder of the Allowed Class 2 Claim may be paid on such other date and upon such other terms as may be mutually agreed upon by the holder of such Allowed Class 2 Claim and the Reorganized Debtor.

4.3     *Class 3 (General Unsecured Claims).*

(a)     <u>Impairment and Voting</u>.  Class 3 is impaired by the Plan.  Each holder of a Class 3 Claim is entitled to vote to accept or reject the Plan.

(b)     <u>Treatment and Distributions</u>.  Each Class 3 Claim shall be paid the full outstanding principal balance of such Class 3 Claim, in Cash, on or before the later of June 30, 2011 or the contractual due date thereof without acceleration, plus interest thereon at the rate of 5% per annum from the Effective Date through the date of payment; provided however, that the amount of interest to be paid to the holder of any Class 3 Claim shall not exceed the amount of interest to which such holder would have been contractually entitled to receive in the absence of the commencement of this Case. Notwithstanding anything herein to the contrary, the holder of a Class 3 Claim may be paid on such other date and upon such other terms as may be mutually agreed upon by the holder of such Allowed Class 3 Claim and the Reorganized Debtor.

(c)     <u>Co-Obligors</u>.  Any payments received by a holder of a Class 3 Claim from any co-obligor shall be credited against sums to which such holder would otherwise be entitled hereunder.  No co-obligor that is an Affiliate of the Debtor, a payment by which reduces the payments due under this Plan, shall be entitled to any rights of subrogation, indemnification or contribution against the Debtor on account thereof.

4.4     *Class 4 (Dividend Claims).*

(a)    <u>Impairment and Voting</u>.  Class 4 is impaired by the Plan.  Each holder of a Class 4 Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Treatment and Distributions</u>.  The Class 4 Claims arising from the ownership of Preferred Stock shall be paid in full, with interest on the outstanding balance thereof accruing from the Effective Date until the date of final payment at the rate of six percent (6%) per annum, on or before the second anniversary of the Effective Date.  Notwithstanding anything herein to the contrary, the holder of the Class 4 Claim may be paid on such other date and upon such other terms as may be mutually agreed upon by the holder of such Allowed Class 4 Claim and the Reorganized Debtor.  No payments shall be made on account of Class 4 Claims until Class 3 Claims have been paid in full.

4.5    *Class 5 (Contingent Claims).*

(a)    <u>Impairment and Voting</u>.   Class 5 is unimpaired by the Plan.  Each holder of a Class 5 Claim is deemed to accept the Plan.

(b)    <u>Treatment and Distributions</u>.  Each holder of a Class 5 Claim shall retain the legal, equitable, and contractual rights to which such Claim entitles the holder, except that the holder may not demand or be entitled to receive accelerated payment of such Class 5 Claim by reason of the Debtor's commencement of this Case or the Debtor's financial condition at any time prior to the Effective Date.  Notwithstanding anything herein to the contrary, the holder of the Class 5 Claim may be paid on such other date and upon such other terms as may be mutually agreed upon by the holder of such Allowed Class 5 Claim and the Reorganized Debtor.

4.6    *Class 6 (Preferred Stock).*

(a)    <u>Impairment and Voting</u>.  Class 6 is impaired by the Plan.  Each holder of an Allowed Class 6 Interest is entitled to vote to accept or reject the Plan.

(b)    <u>Treatment and Distributions</u>.  Each holder of a Class 6 Interest shall receive, on account of and in final settlement and satisfaction thereof an amount equal to the redemption price of such Interest pursuant to 5(c)(i) of the Certificate of Designations less any amount that such holder can assert as a Class 4 Claim, plus interest on the outstanding balance thereof at the rate of 6% per annum, from the Effective Date until the date of final payment (the "Class 6 Payout").  Payments on account of the Class 6 Payout (up to the outstanding balance thereof) shall be made as follows:  After payment in full of the Class 3 Claims and Class 4 Claims, upon the sale of any Real Estate Interests, 50% of the Net Real Estate Proceeds shall be paid to holders of Class 6 Interests in proportion to their respective Interests and on account of such Interests at or promptly after the closing.  All payments on account of the Class 6  Payout shall be applied first to any accrued and unpaid interest and then to the outstanding principal balance.  Irrespective of the occurrence of any sales of Real Estate Interests, the following minimum payments shall be made on account of the Class 6 Payout:

| Date | Cumulative Payments |
| --- | --- |

| On or before the second anniversary of the Effective Date | At least $10 Million (or the outstanding balance, whichever is less) |
|---|---|
| On or before the third anniversary of the Effective Date | At least $25 Million (or the outstanding balance, whichever is less) |
| On or before the fourth anniversary of the Effective Date | At least $40 Million (or the outstanding balance, whichever is less) |
| On or before the fifth anniversary of the Effective Date | The remaining outstanding balance |

(c)    Termination of Rights.  From and after the Confirmation Date, the Certificate of Designations of PPHI, dated June, 24, 2004, and all other documents relating to the Preferred Stock and the rights of the holders thereof shall be null and void and of no further force and effect.  The holders of Preferred Stock shall not thereafter be entitled to exercise any remedies available to them under such documents and shall only be entitled to the payments described herein.

4.7    *Class 7 (Equity).*

(a)    Impairment and Voting.  Class 7 is unimpaired by the Plan.  Each holder of a Class 7 Interest is deemed to accept the Plan.

(b)    Treatment and Distributions.  The holder of the Class 7 Interests will continue to hold their Interests in the Debtor and their legal, equitable and contractual rights will remain in effect.

## ARTICLE 5. IMPLEMENTATION AND EFFECT OF PLAN

5.1    *Plan Implementation.*  The Plan shall be consummated on the Effective Date.  The Confirmation Order shall empower and authorize the Debtor and the Reorganized Debtor, prior to or after the Confirmation Date, to take all actions that are necessary to implement the Plan.*Plan Distributions*.  Commencing on the Effective Date, the Reorganized Debtor shall make the payments contemplated under this Plan.

5.3    *Vesting of Property.*   In accordance with Sections 1123(a)(5) and 1141 of the Bankruptcy Code, on the Effective Date, title to all of the Assets owned by the Reorganized Debtor.

5.4    *Plan Funding.*  The Plan shall be funded by cash of the Reorganized Debtor's subsidiary, Pitcairn Properties, Inc., the sale of Real Estate Interests, recoveries from the pursuit of any Causes of Action, and future debt and equity investments in the Reorganized Debtor.

5.5    *Plan Administration.*  The Reorganized Debtor shall make all Distributions required by this Plan to holders of Allowed Administrative Expenses, Claims and Interests. Distributions shall be made to each holder of an Allowed Administrative Expense, Creditor, or Interest at the address (i) specified on such person's proof of claim or interest, Request or at such

other address as shall be specified by such person in writing to the Debtor prior to the date of any distribution, or (ii) if no proof of claim or Request has been filed, at the last known address of such person according to the Debtor's books and records. Any Distributions otherwise due to any holder of a Claim or Interest pursuant to this Plan shall not be distributed if the aggregate amount of Cash to be distributed is less than $20.00.

(a)     Final distributions under the Plan shall be in full and final satisfaction, settlement, release and discharge of all Claims, Administrative Expenses or Interests.

(b)     The Reorganized Debtor may, but shall not be required to, set off against or recoup from any Claim or Interest, and any payments to be made pursuant to the Plan on account of such Claim or Interest, any claims of any nature whatsoever that the Reorganized Debtor may have against the holder thereof, but neither the failure to do so nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Reorganized Debtor of any such claim or cause of action that the Reorganized Debtor may have against such claimant. Further, to the extent permitted by applicable law, the Reorganized Debtor may assert the rights of set-off or recoupment in the course of its pursuit of any Cause of Action.

5.6     *Disputed Administrative Expenses, Claims and Interests*.

(a)     At such time as a Disputed Administrative Expense, Claim or Interest becomes an Allowed Administrative Expense, Claim or Interest, in whole or in part, then the Reorganized Debtor shall, within ninety days, make all payments to the holder of such claim to which such holder would have been entitled from the Effective Date until the date such Disputed Administrative Expense, Claim or Interest becomes an Allowed Administrative Expense, Claim or Interest.

5.7     *Undeliverable Distributions; Uncashed Checks*. If any Distribution to a person holding an Allowed Administrative Expense, Claim or Interest is returned as undeliverable, or if any check delivered pursuant to a Distribution remains uncashed for ninety (90) days, the amount of such Distribution shall be returned to the Reorganized Debtor and, in the case of an uncashed check, such check shall automatically become null and void. Thereafter, until the earlier of (i) six months after the Effective Date or (ii) entry of a final decree, the person entitled to such Distribution may request that the Reorganized Debtor issue a check equal to the Distribution and shall thereupon be entitled to the amount of such Distribution. After the earlier of (i) six months after the Effective Date or (ii) entry of a final decree, the entitlement of such person to such Distribution shall be discharged and the Reorganized Debtor shall have no further obligation to make such Distribution.

5.8     *Statutory Fees.* In compliance with Section 1129(a)(12) of the Bankruptcy Code, the Reorganized Debtor shall cause all fees payable under Section 1930 of Title 28 of the United States Code to be paid when due.

5.9     *Surrender and Cancellation of Notes or Other Instruments.* As of the Confirmation Date, except as specifically provided in the Plan, any security, note, instrument or

certificate evidencing a Claim, lien, Preferred Stock Interest or Encumbrance outstanding immediately prior to the Confirmation Date, other than a Claim in Class 5 or an Interest in Class 7, shall be canceled. Except for the right to receive Distributions required to be made under this Plan, the holder of such a canceled security shall have no rights arising from such canceled security or Interest.

5.10    *The Reorganized Debtor Following the Effective Date*.  Following the Effective Date, the Reorganized Debtor shall continue to: (a) consummate and effectuate the Plan; (b) make distributions in accordance with this Plan; (c) investigate, pursue and prosecute Causes of Action (and compromise and settle any such Causes of Action); (d) prosecute objections to Claims, Interests and Requests; (e) file any required reports or returns; and (f) otherwise perform the functions and take the actions provided for or permitted herein or in any other agreement executed by the Debtor or Reorganized Debtor pursuant to the Plan.  After the Effective Date, the Reorganized Debtor is entitled to hire and compensate Professionals, including, among others, attorneys and accountants, without further Court approval.

5.11    *Committees*.    Any committee appointed pursuant to Section 1102 of the Bankruptcy Code shall be permanently dissolved on the Effective Date.

5.12    *Allocation of Plan Distributions Between Principal and Interest.*    Except as otherwise provided in the Plan, to the extent that any Allowed Claim or Interest is entitled to distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all purposes including without limitation federal income tax purposes, be allocated to accrued but unpaid interest and then to principal.

5.13    *Transfer and Stamp Taxes*.    All transfer of property under the Plan shall be exempt from real estate transfer or stamp taxes to the fullest extent provided by Section 1146 of the Code.

## ARTICLE 6.   PROVISIONS FOR THE ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1    *Assumption of Executory Contracts*.    Any and all executory contracts and unexpired leases that are not expressly rejected by the Debtor or are not the subject of a pending motion for approval of the rejection thereof, on or before the Effective Date, shall be deemed assumed.

6.2    *Rejection Damage Claims*.    A proof of claim evidencing any rejection damage claim shall be filed with the Bankruptcy Court, with copies to: (i) Hangley Aronchick Segal & Pudlin, P.C., One Logan Square, 27th Floor, Philadelphia, PA 19103, Attention: James M. Matour, Esquire, and (ii) Young Conaway  Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, Attention: James L. Patton, Jr. , Esquire and Robert F. Poppiti, Jr. , Esquire, counsel to the Debtor, no later than the later of the Bar Date or thirty (30) days after the date of rejection, unless otherwise ordered by the Bankruptcy Court. Failure to file on a timely basis a proof of a rejection damage claim shall result in the

Disallowance of such Claim, and the holder of such rejection damage claim shall be forever barred from asserting such Claim.

## ARTICLE 7.   DISCHARGE

The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtor (and only the Debtor), or any of their assets.  Except as otherwise provided in this Plan or the Confirmation Order: (i) on the Effective Date, the Debtor shall be deemed discharged and released to the fullest extent permitted by Section 1141 of the Bankruptcy Code from all Claims and Interests, including, but not limited to, demands, liabilities, Claims and Interests that arose before the Confirmation Date and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of claim or proof of interest based on such Claim or Interest has been Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim or Interest is allowed pursuant to Section 502 of the Bankruptcy Code, or (c) the holder of a Claim or Interest based on such debt or Interest has accepted the Plan; and (ii) all persons shall be precluded from asserting against the Debtor, their successors, or their assets any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date.  Except as otherwise provided in the Plan or the Confirmation Order, the Confirmation Order shall act as a discharge of any and all Claims against and all debts and liabilities of the Debtor, as provided in Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment against the Debtor at any time obtained to the extent that it relates to a Claim so discharged.

## ARTICLE 8.   EFFECTIVE DATE AND CONDITIONS PRECEDENT

8.1     *Conditions Precedent to Effective Date*.  The occurrence of the Effective Date and the consummation of the Plan set forth herein are subject to the following conditions precedent that:

(a)     The Confirmation Order, in form and substance acceptable to the Debtor shall have been signed by the Bankruptcy Judge presiding over the Chapter 11 Case, and there shall not be a stay or injunction in effect with respect thereto;

(b)     The Debtor shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are determined by the Debtor to be necessary to implement the Plan.

8.2     *Effective Date*.  The Effective Date shall be a date selected by the Debtor that is within thirty (30) days after the first business day on which all conditions precedent to the Effective Date specified in Section 9.1 hereof have been satisfied or waived.

8.3     *Notice of Effective Date*.  Within ten (10) days after the occurrence of the Effective Date, the Debtor shall send notice, via first-class mail, of the occurrence of the Effective Date to all holders of Administrative Expenses, Claims and Interests, and all other parties in interest in the Case.

8.4     *Failure of Condition Precedent*.  If the consummation of the Plan does not occur, whether by failure to satisfy any of the conditions precedent contained in Section 9.1 hereof, the withdrawal of the Plan, or otherwise, the Plan and the Confirmation Order shall be deemed null and void, and, in such event, any consents or releases given in anticipation of the implementation of the Plan shall be void *ab initio* and nothing contained herein shall affect the rights or remedies of the Debtor, any Committee or any Creditor or Security Interest Holder.

## ARTICLE 9.   POST-CONFIRMATION CORPORATE ORGANIZATION

9.1     *Management of the Debtor Post-Confirmation.*  After the Effective Date, the Reorganized Debtor shall continue to be managed by its current officers, subject to the action of the Reorganized Debtor's Board of Directors.  After the Effective Date, the initial Board of Directors of the Reorganized Debtor shall consist of those individuals who were directors of the Debtor immediately prior to the Effective Date.

9.2     *Authorization of Corporate Action.*  The entry of the Confirmation Order shall constitute a direction to and authorization of the Debtor and Reorganized Debtor to take or cause to be taken any corporate action necessary or appropriate before or after the Confirmation Date for the effectuation of this Plan.  All actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.

9.3     *Causes of Action.*  Unless a claim or Cause of Action against a person or entity is expressly waived, abandoned, relinquished, released, compromised, settled or treated otherwise in the Plan or any Final Order, including, without limitation, the Confirmation Order, the Debtor expressly reserves such claim or Cause of Action, whether existing as of the Petition Date or thereafter arising, including, but not limited to, any adversary proceeding filed in the Chapter 11 Case and any and all claims and Causes of Action not specifically identified or of which the Debtor may presently be unaware of which arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist, for later action by the Reorganized Debtor, as applicable, and therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after Confirmation based on the Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been expressly waived and released in the Plan.  The Reorganized Debtor may pursue, settle, or withdraw any Causes of Action, including without limitation the adversary proceeding against the holder of the Class 6 Interests and related persons, pending in this Court and docketed as Adversary #_____.  The Bankruptcy

Court shall retain jurisdiction over such Causes of Action commenced prior to the closing of this Case, after the Case is closed and until the final resolution thereof.

## ARTICLE 10.   OBJECTIONS TO CLAIMS

10.1   *Objection to Administrative Expenses, Claims or Interests.*

(a)   Notwithstanding the occurrence of the Confirmation Date or the Effective Date, the Reorganized Debtor may object to the allowance of any Administrative Expense, Claim or Interest not previously Allowed by Final Order.

(b)   Objections to Administrative Expenses, Claims or Interests may be filed by the Debtor at any time before the later of: (a) one-hundred-and-eighty (180) days following the Effective Date, or (b) sixty (60) days after the filing of a Request or proof of claim or interest relating to such Administrative Expense, Claim or Interest; provided, however, that such time period may be extended upon motion to the Court.  Such objections shall be served upon the holder of the Claim, Interest or Request to which an objection is made.  Any objection not timely filed shall be deemed waived by all parties-in-interest.  Neither the Reorganized Debtor nor its counsel shall have any obligation or duty to review, investigate, prosecute or file any objections to any Claims, Interests or Requests.

10.2   *Bar Date for Claims and Interests.*  Pursuant to an Order of the Bankruptcy Court, the Bar Date was fixed as _____, 2010.  The deadlines for filing Administrative Expense Claims is set forth in Section 3.2(c) of this Plan.

## ARTICLE 11.   PLAN DEFAULTS

11.1   *Notice of Default Under the Plan.*  No default shall be declared under the Plan unless any payment due under the Plan (other than a payment required on the Effective Date) shall not have been made or deemed made thirty (30) days after the receipt of written notice of the default by the Reorganized Debtor and its counsel.

11.2   *Content of Notice of Default.*  Any notice of default as provided for in the Plan shall: (a) conspicuously state that it is a notice of default; (b) describe with particularity the nature of the default, including a reference to the specific provisions of the Plan as to which a default or defaults have allegedly occurred; and (c) describe any action required to cure the default, including the exact amount of any payment required to cure such default, if applicable.

11.3   *Cure of Default Under the Plan.*  The Debtor shall have ninety (90) days after receipt of a written notice of default under the Plan in which to cure such default

.

## ARTICLE 12.   MODIFICATIONS TO THE PLAN

12.1   *Modifications Prior to the Confirmation Date.*  At any time prior to the

Confirmation Date, the Debtor may withdraw the Plan or propose amendments to, or modifications of, the Plan.

12.2    *Modifications Prior to the Effective Date.*    Prior to the Effective Date, the Debtor may, so long as it does not materially and adversely affect the interests of holders of Administrative Expenses, Claims or Interests, or the Debtor, remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and effect of the Plan.

12.3    *Other Modifications.*  Subject to approval of the Bankruptcy Court after notice and a hearing, the Debtor may amend or modify the Plan in any respect after the Confirmation Date.

## ARTICLE 13.   RETENTION OF JURISDICTION

13.1    *Retention of Jurisdiction.*  Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Case after the Effective Date to the full extent legally permissible, including, without limitation, for the following purposes:

(a)    to consider any modification of the Plan under Section 1127 of the Bankruptcy Code or modification of the Plan after substantial consummation as defined in Section 1101(2) of the Bankruptcy Code;

(b)    to determine if "substantial consummation" as defined in Section 1101(2) of the Bankruptcy Code has occurred;

(c)    to hear and determine all Causes of Action and all controversies, suits and disputes that may arise in connection with the interpretation or enforcement of this Plan;

(d)    to hear and determine all requests or disputes with respect to compensation and reimbursement of expenses which may be made before or after the Confirmation Date;

(e)    to hear and determine all objections, defenses and counter-claims to Claims, controversies, suits, disputes and Avoidance Actions that may be pending at or initiated after the Confirmation Date;

(f)    to consider and act on the compromise and settlement of any Claim against or Avoidance Action on behalf of the Debtor's estate;

(g)    to direct the Debtor, or any other necessary parties, to perform any act that is necessary for the consummation of the Plan;

(h)    to enforce the injunctions contained in the Confirmation Order;

(i)     to set aside liens and encumbrances, and to adjudicate any Avoidance Action, including preferences, transfers, assets or damages, to which the Debtor or any other party may be entitled under applicable provisions of the Bankruptcy Code or other federal, state or local law;

(j)     to adjudicate all controversies concerning the classification, liquidation or allowance of any Claims or Requests;

(k)     to hear and determine all controversies relating to any Lease Agreement, Asset Purchase Agreement or Sale;

(l)     to hear and determine all controversies relating to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease, including, without limitation, any motion filed pursuant to Section 6.1 hereof;

(m)     to continue to seek to recover all Assets and properties of the Debtor wherever located;

(n)     to consider and act on such other matters as are consistent with the Plan;

(o)     to consider any motions or requests to abandon property of the Debtor's estate;

(p)     to enter a final decree closing this Case.

13.2    *Abstention.*    If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or otherwise is without jurisdiction over any matter arising out of this proceeding, including any Causes of Action, this Section shall have no effect upon and shall not preclude the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE 14.    LIMITATIONS ON LIABILITY

14.1    ***No Liability For Solicitation or Participation.***  **As specified in Section 1125(e) of the Bankruptcy Code, persons that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, are not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.**

14.2    ***No Liability For Solicitation or Participation.***  **The Debtor and its officers, directors, managers, employees, members, agents, advisors, accountants, attorneys and representatives, in each case solely in their capacity as such (each, an "Exculpated Party") shall neither have nor incur any liability to any person or entity for any action taken or omitted to be taken after the Petition Date in connection with or related to the Chapter 11**

**Case, including, without limitation, the preparation and filing of the Chapter 11 Case, or the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan; provided, however, that the exculpation provided for in Section 14.1 of the Plan shall not affect or modify any obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan and shall not release any action or inaction constituting willful misconduct or gross negligence, in each case subject to the determination of such by final order of a court of competent jurisdiction; provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities, if any, under the Plan and such reasonable reliance shall form an absolute defense to any such claim, Cause of Action or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the benefits and protections of section 1125(e) of the Bankruptcy Code.**

14.3     *Injunction.*  Except as provided in the Plan or the Confirmation Order, all entities who have held, hold or may hold Claims against or Interests in any of the Debtor or the Reorganized Debtor are permanently enjoined, on and after the Effective Date, from:

> (a)     Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest;

> (b)     The enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Reorganized Debtor;

> (c)     Creating, perfecting or enforcing any encumbrance of any kind against the Debtor or against the property or interests on property of the Reorganized Debtor on account of any such Claim.

## ARTICLE 15.   MISCELLANEOUS TERMS

15.1     *Priority Status.*  In the event the Debtor fails fully to effectuate this Plan, and this Case is converted to a case under Chapter 7 of the Bankruptcy Code or the Debtor's assets are otherwise liquidated, all Claims and Expenses shall retain the priority to which they were entitled prior to the confirmation of the Plan.  Claims entitled to priority pursuant to Section 507 of the Bankruptcy Code as of the Effective Date shall continue to have such priority and shall be paid in full in order of priority as provided therein prior to payment of any other secured or unsecured Claim.  Secured Claims shall be paid out of the proceeds of the collateral securing such Claims. Any remaining proceeds thereafter shall be paid: first, to holders of Claims in Classes 3 and 5 until paid in full; second, to holders of Claims in Class 4 and Interests in Class 6, until paid in full; and third, the residuum to holders of Interests in Class 7.

15.2     *Automatic Stay.*  The automatic stay provided for under section 362 of the Bankruptcy Code shall remain in effect until the Effective Date.

15.3    *Preservation of Insurance.*  The Debtor's release from and payment of Claims as provided in the Plan shall not diminish or impair the enforceability of any insurance policy that may cover any Claims, including, without limitation, any Claims on account of the Debtor's officers or directors or any other person or entity.

15.4    *Waiver of Fourteen (14) Day Stay.*  The Debtor requests as part of the Confirmation Order a waiver from the Bankruptcy Court of the fourteen (14) day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the fourteen (14) day stay of Bankruptcy Rule 6004(h).

15.5    *Terms Binding*.  On the Effective Date, all provisions of this Plan shall be binding upon the Debtor, the Reorganized Debtor, any Committees, all holders of Administrative Expenses, Claims or Interests, and all other entities that may be affected in any manner by the Plan.

15.6    *Captions.*  Article and section captions as used in this Plan are for convenience purposes and shall not affect the construction of this Plan.

15.7    *Plan Interpretation*.  The Plan shall be construed in accordance with the Bankruptcy Code, applicable federal and state law and, to the extent not inconsistent with the foregoing, the provisions of the Disclosure Statement.

15.8    *Inconsistencies*.  In the event that there is any inconsistency between the Plan and the Disclosure Statement, or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern.

15.9    *Governing Law*.  Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules); (ii) an express choice of law provision in any agreement, contract, instrument, or document provided for, or executed in connection with, the Plan, or (iii) the Delaware Statutes, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania without giving effect to the principles of conflict of laws thereof.

15.10   *Severability*.  Prior to Confirmation, if any term or provision of the Plan which does not govern the treatment of Claims or Interests or the conditions to the Effective Date is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and

provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

15.11  *Notice.*  All notices, requests and demands to or upon the Debtor to be effective shall be in writing and, unless otherwise provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, with a copy by mail, addressed as follows, or to any other address or telephone or facsimile number designated in writing by such party in the manner provided herein:

(a)　　*If to the Debtor:*

Pitcairn Properties Holdings, Inc.
Attention:  Chief Accounting Officer
One Pitcairn Place
165 Township Line Road
Suite 1500
Jenkintown, PA 19046-3599

With copies to:

James M. Matour
Matthew A. Hamermesh
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
Telephone: 215-568-6200
Facsimile: 215-568-0300

- and –

James L. Patton, Jr.
Robert F. Poppiti, Jr.
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

15.12  *Binding Effect.*  The Plan shall be binding upon and inure to the benefit of the Debtor, holders of Claims and Equity Interests, and all their respective successors and assigns.

15.13 *No Admissions*.    Notwithstanding anything herein to the contrary, nothing contained in the Plan or Disclosure Statement shall be deemed an admission by the Debtor with respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of the classification of any Claim.

## ARTICLE 16. CONFIRMATION REQUEST

16.1    *Confirmation Request*.    The Debtor hereby requests confirmation of the Plan pursuant to sections 1129(a) and (b) of the Bankruptcy Code.

Dated:   September 2, 2010

**PITCAIRN PROPERTIES HOLDINGS, INC.**

By:    /s/ Salah A. Mekkawy
        Salah A. Makkawy
        Chief Executive Officer
